**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

PFIZER INC.,<br>
PHARMACIA & UPJOHN COMPANY, and<br>
PFIZER HEALTH AB,<br>
<br>
       Plaintiffs,<br>
<br>
    v.<br>
<br>
TEVA PHARMACEUTICALS USA, INC.,<br>
<br>
       Defendant.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Case No: 07-CV-11198 (LTS) (KNF)

</td></tr>
</table>

## SECOND AFFIDAVIT OF DON M. KENNEDY IN SUPPORT OF
## TEVA PHARMACEUTICALS USA, INC.'S MOTION TO TRANSFER

   This affidavit and attached Exhibits 1 through 7 are relied upon in Teva's Reply Brief in Support of its Motion to Transfer.

   I, Don M. Kennedy, on oath, depose and say:

1.  As stated in my earlier affidavit dated January 16, 2008, I have been one of the primary attorneys for Teva Pharmaceuticals USA, Inc. ("Teva") and IVAX Pharmaceuticals, Inc. ("IVAX") in two prior actions instituted by Pfizer Inc., Pharmacia & UpJohn Company LLC, and Pfizer Health AB (collectively, "Pfizer") regarding United States Patent No. 5,382,600 ("'600 Patent") in the U.S. District Court for the District of New Jersey: *Pfizer Inc., et al. v. Teva Pharmaceuticals USA, Inc.*, No. 04-1418 DMC (D.N.J. 2004) ("First Action"), and *Pfizer Inc., et al. v. IVAX Pharmaceuticals, Inc., et al.*, No. 07-CV-0174 DMC (D.N.J. 2007) ("Second Action"). I am personally familiar with the matters set forth in this Affidavit.

2.  By letter to Magistrate Judge Mark Falk on August 22, 2007, less than one month prior to the close of fact discovery in the Second Action, Pfizer moved the Court to compel Teva and

IVAX to produce documents related to Detrol LA®. The relevant portion of Pfizer's letter-brief to Magistrate Judge Falk is attached as Exhibit 1.

3.     On the date that fact discovery was scheduled to close in the Second Action, September 14, 2007, Pfizer supplemented its responses to Teva's Interrogatory Nos. 12 and 26 in the First Action to include Detrol LA®. The relevant portion of Pfizer's Supplemental Objections and Responses to Interrogatory Nos. 12 and 26 is attached as Exhibit 2.

4.     On October 1, 2007, Pfizer submitted a supplemental letter in support of its motion to compel, as requested during a telephone conference with Magistrate Judge Falk on September 19, 2007. In its letter-brief, Pfizer argued that information related to its *"tolterodine* franchise," including Detrol LA®, is relevant to the parties' *"tolterodine* litigation." The relevant portion of Pfizer's October 1, 2007 letter-brief is attached as Exhibit 3.

5.     During a November 9, 2007 hearing on Pfizer's motion to compel, Magistrate Judge Falk found that Detrol LA® is "relevant in a discovery context to the issue of commercial success, which of course goes to negate obviousness, and obviousness is really [] one of the central issues in the case." Magistrate Judge Falk granted Pfizer's motion to compel IVAX and Teva to produce documents regarding Detrol LA®. A transcript of the relevant portion of the November 9, 2007 hearing is attached as Exhibit 4.

6.     In response to Pfizer's motion and Magistrate Judge Falk's ruling, Teva and IVAX have produced more than 17,000 pages of documents relating to Detrol LA® during the period from December 2007 through February 2008.

7.     Based on our informal review of dockets in the U.S. District Court for the District of New Jersey, Pfizer has initiated at least seven patent infringement actions in that district since January 2004.

8.     Presently, the parties have agreed that motions for summary judgment in the Second Action are due on April 25, 2008.

9.     Attached as Exhibit 5 is a true and accurate copy of *MasterCard International, Inc. v. Lexcel Solutions, Inc.*, No. 03 Civ.7157(WHP), 2004 WL 1368299 (S.D.N.Y. June 16, 2004).

10.    Attached as Exhibit 6 is a true and accurate copy of *The Whistler Group, Inc. v. PNI Corp.*, No. Civ. A.3:03-CV-1536-G, 2003 WL 22939214 (N.D. Tex. Dec. 5, 2003).

11.    Attached as Exhibit 7 is a true and accurate copy of *Abbott Laboratories v. Selfcare, Inc.*, No. 98 C 7102, 1991 WL 162805 (N.D. Ill. Mar. 15, 1999).


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 19th DAY OF FEBRUARY, 2008.

*Don M. Kennedy*
Don M. Kennedy

# EXHIBIT 1



SHEILA F. MCSHANE
Associate

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4637 Fax: (973) 639-6482
smcshane@gibbonslaw.com

August 22, 2007

**VIA FACSIMILE - (973) 645-3097**

The Honorable Mark Falk
United States Magistrate Judge
United States District Court
U.S.P.O. & Courthouse
One Federal Square
Newark, New Jersey 07101

> Re:   **Pfizer Inc., _et al._ v. Ivax Pharmaceuticals, Inc., C.A. No. 07-0174**

Dear Judge Falk:

    We represent Plaintiffs and Counterclaim Defendants Pfizer Inc., Pharmacia &
Upjohn Company, and Pfizer Health AB (collectively, "Pfizer"). We write seeking an
order compelling Defendant and Counterclaim Plaintiff IVAX Pharmaceuticals, Inc.
("IVAX") and Counterclaim Plaintiff Teva Pharmaceuticals USA, Inc. ("Teva") to
produce documents related to Detrol® LA, one of two Pfizer medications covered by
Pfizer's United States Patent No. 5,382,600 (the "'600 patent"). The parties conferred
unsuccessfully in an effort to resolve this dispute.

    IVAX and Teva allege that Pfizer's '600 patent is invalid as obvious. Because
Pfizer's requests are reasonably calculated to lead to the discovery of admissible
evidence related to this claim, particularly in the form of evidence related to secondary
considerations of non-obviousness, the Court should require IVAX and Teva to produce
responsive documents.

    Brief Background

    IVAX filed an ANDA with the FDA seeking approval to market a generic version
of Detrol®. IVAX's ANDA includes a "paragraph IV" certification in which IVAX claims
that the '600 patent is invalid as obvious. Pfizer sued IVAX for infringement of the '600
patent under provisions of the Hatch-Waxman Act which are well-known to the Court,
and IVAX counterclaimed, alleging patent invalidity and unenforceability. Teva, which
recently became IVAX's parent company, inserted itself as a "Counterclaim Plaintiff,"

#1221226 v1
070370-58973

GIBBONS P.C.

The Honorable Mark Falk
August 22, 2007
Page 2

repeating IVAX's allegations. Teva's and IVAX's allegations mimic Teva's allegations from an earlier case between Pfizer and Teva concerning identical subject matter.[1]

Among other things, Pfizer's '600 patent covers a chemical compound known as "tolterodine tartrate," which is the active ingredient in two Pfizer medications that the FDA has approved for the treatment of symptoms related to overactive bladder: Detrol® (an immediate release formulation) and Detrol® LA (a long-acting formulation).

<u>The Requests In Dispute Seek Relevant, Discoverable Information</u>

Pfizer has asked Teva and IVAX to produce documents related to Detrol LA®. (<u>See</u> Request Nos. 71, 72, 74, 76, 77, and 79 to IVAX, and Request Nos. 27, 28, 30, and 31 to Teva, reproduced in Exhibit A to this letter.) Teva and IVAX refuse to produce documents on grounds that IVAX's ANDA relates only to Detrol®, and not to Detrol LA®. This is an improper basis on which to withhold relevant discovery.

IVAX's ANDA provides a jurisdictional basis for this lawsuit, but it does not limit what information is discoverable. The primary issue for the Court to resolve in this case is the validity of Pfizer's '600 patent. Accordingly, if a request is reasonably calculated to lead to the discovery of admissible evidence on issues related to validity, Teva and IVAX must produce documents in response. Fed. R. Civ. P. 26. Pfizer's requests easily meet this threshold.

Courts must consider the following factors in an obviousness analysis: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) any objective evidence (or "secondary considerations") of non-obviousness.[2] According to the Federal Circuit, "evidence of secondary considerations may often be the <u>most</u> probative and cogent evidence in the record."[3]

As part of its secondary consideration showing, a patentee may present evidence that products embodying its patented invention are commercially successful.[4] Pfizer's Detrol® and Detrol® LA products both contain tolterodine tartrate, which is expressly covered by claim 4 of the '600 patent. Accordingly, both products embody the invention in Pfizer's '600 patent. Pfizer is therefore entitled to discovery related to Detrol® LA,

---

[1]    The parties stipulated to the dismissal of that first action after Teva withdrew its own Detrol® ANDA, and, given the subject-matter overlap, the parties agreed to incorporate all fact and expert discovery from the first action into the present action.

[2]    <u>Specialty Composites</u> v. <u>Cabot Corp.</u>, 845 F.2d 981, 989-90 (Fed. Cir. 1988) (<u>citing</u> <u>Graham</u> v. <u>John Deere Co.</u>, 383 U.S. 1, 17-18 (1966)).

[3]    <u>Ruiz</u> v. <u>A.B. Chance Co.</u>, 234 F.3d 654, 667 (Fed. Cir. 2000 ) (citation omitted, emphasis added).

[4]    <u>Glaxo Group Ltd.</u> v. <u>Apotex, Inc.</u>, 376 F.3d 1339, 1349 (Fed. Cir. 2004).

GIBBONS P.C.

The Honorable Mark Falk
August 22, 2007
Page 3

and to determine whether such discovery bears on commercial success. The documents and information might also be relevant to other secondary considerations, such as copying, and, because the '600 patent covers both Detrol® and Detrol® LA, the documents might contain direct evidence (including potential admissions) bearing on the patent's validity.

Teva's and IVAX's objections are particularly inappropriate given their actions with respect to Detrol® LA. First, Teva made at least 9 separate document requests of Pfizer for information related to products covered by the '600 patent, including Detrol® LA. Subject to certain objections, Pfizer produced whatever responsive documents it had. Second, Teva and IVAX rely on the Detrol® LA information that Pfizer produced to attack the validity of the '600 patent. For example, their expert Dr. Leffler incorporated the information into a report in which he opines that factors other than the invention claimed in the '600 patent are responsible for sales of products embodying the invention, an opinion that is related to the commercial success factor.

Teva and IVAX apparently believe that they have the right to discovery about Detrol® LA for purposes of attacking Pfizer's '600 patent, but that Pfizer does not have that right for purposes of defending its property. The Court should not permit Teva and IVAX to benefit from this prejudicial double standard.

Conclusion

For the foregoing reasons, Pfizer respectfully requests that the Court order Teva to produce all documents responsive to Pfizer's Request Nos. 27, 28, 30, and 31. If Teva has redacted responsive information on documents that it has produced, Pfizer requests that the Court order Teva to produce un-redacted versions of those documents. Pfizer also respectfully requests that the Court order IVAX to produce all documents responsive to Pfizer's Requests Nos. 71, 72, 74, 76, 77, and 79. If IVAX has redacted responsive information on documents that it has produced, Pfizer requests that the Court order IVAX to produce un-redacted versions of those documents.

Respectfully,

Sheila F. McShane

cc:    Michael Patunas, Esq. (via email)
       Don M. Kennedy, Esq. (via email)
       John Englander, Esq. (via email)
       Jeffrey J. Oelke, Esq. (via email)

# EXHIBIT 2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PFIZER INC.,<br>PHARMACIA & UPJOHN COMPANY, and<br>PFIZER HEALTH AB,<br><br>   Plaintiffs,<br><br>  v.<br><br>IVAX PHARMACEUTICALS, INC.,<br><br>   Defendant.<br><br>IVAX PHARMACEUTICALS, INC. and<br>TEVA PHARMACEUTICALS USA, INC.,<br><br>   Counterclaim-Plaintiffs,<br><br>  v.<br><br>PFIZER INC.,<br>PHARMACIA & UPJOHN COMPANY, and<br>PFIZER HEALTH AB,<br><br>   Counterclaim-Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>C. A. No. 07-0174 (DMC) (MF) |

**PFIZER'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
TEVA'S INTERROGATORY NOS. 12 and 26**

Pursuant to Federal Rule of Civil Procedure 26(e)(2) and paragraph 3 of the

Pretrial Scheduling Order, Plaintiffs Pfizer Inc., Pharmacia & Upjohn Company, and Pfizer

Health AB (collectively, "Pfizer") hereby supplement their responses to Defendant and

Counterclaim-Plaintiff Teva Pharmaceuticals USA, Inc.'s ("Teva") Interrogatory Nos. 12 and 26.

## PRELIMINARY STATEMENT

A.      The specific Responses set forth below are for the purposes of discovery only, and Pfizer neither waives nor intends to waive, but expressly reserves any and all objections it may have as to the competence, relevance, materiality, privilege, admissibility, or use in any further proceedings in this action (including the trial of this action) or in any other action of any information, documents, or writings produced, identified, or referred to herein, or to the introduction of any evidence at any proceeding (including the trial of this action) relating to the subjects covered by such Responses.

B.      Pfizer expressly reserves its right to rely, at any time including trial, upon subsequently discovered information or information omitted from the specific Responses set forth below as a result of mistake, oversight, or inadvertence.

C.      Pfizer expressly reserves its right to amend or to supplement the specific Responses set forth below with any additional information that emerges through discovery or otherwise.

D.      The specific Responses set forth below are based upon Pfizer's interpretation of the language used in Teva's Interrogatories, and Pfizer reserves its right to amend or supplement its Responses in the event that Teva asserts an interpretation that differs from Pfizer's interpretation.

## GENERAL OBJECTIONS

1.      Pfizer incorporates by reference the General Objections set forth in its Responses to Teva's First Set of Interrogatories.  The General Objections incorporated by reference shall have the same force as if fully stated herein.

## TEVA'S DEFINITIONS

1.     Pfizer incorporates by reference its objections to Teva's Definitions set forth in its Responses to Teva's Second, Third, and Fourth Sets of Interrogatories.  Objections to Teva's Definitions that are incorporated by reference shall have the same force as if fully stated herein.

## SPECIFIC OBJECTIONS AND RESPONSES

### Interrogatory No. 12

State the basis for any contention by plaintiffs that any secondary considerations of non-obviousness, including but not limited to:  (1) commercial success; (2) long felt but unsolved needs; (3) failed efforts of others; (4) copying by others; (5) praise for the invention; (6) unexpected results; (7) disbelief of experts; (8) general skepticism of those in the art; (9) commercial acquiescence; and (10) simultaneous development, that support the validity of the '600 patent.

### Response to Interrogatory No. 12

Pfizer objects to this Interrogatory insofar as it calls for legal conclusions as to secondary indicia of nonobviousness.  To the extent that this Interrogatory calls for the substance of legal advice and/or opinions as to the nonobviousness of the claims of the '600 patent, Pfizer objects to this Interrogatory as calling for information protected by the attorney-client privilege and work product doctrine.  Pfizer further objects to this Interrogatory as comprising at least ten (10) interrogatories and states that it should be treated as such.  Subject to and without waiving the foregoing general and specific objections, Pfizer responds as follows.

Pfizer responds that one embodiment of the invention claimed in the '600 patent is commercialized in the United States under the trade name Detrol®, and in Europe under the

trade name Detrusitol®.  Detrol®/Detrusitol® is the most prescribed pharmaceutical for treatment of overactive bladder in the world, grossing close to $2.5 billion in sales since 1998 in the United States alone.  There exists a nexus between the invention claimed in the '600 patent and the commercial success of Detrol®/Detrusitol®.

Pfizer further responds that the embodiment of the invention claimed in the '600 patent presently commercialized as Detrol® met a long felt but unsolved need in the field of urinary incontinence, which is evidenced by the fact that, at its launch, Detrol® was the first new medication approved for a bladder control problem in the United States in more than 20 years.

Pfizer further responds that, by the embodiment of the invention claimed in the '600 patent presently commercialized as Detrol®/Detrusitol®, the named inventors had succeeded where others had previously failed.  Specifically, the invention gave rise to a safe urinary incontinence treatment having considerably fewer side effects caused by a lack of selectivity, dry mouth in particular, than bladder control products in existence prior to and at the time of the approvals of Detrol®/Detrusitol®.  For example the compound, terodiline, which is disclosed in the '600 patent, had been similarly proven to treat urinary continence but was not commercially viable due to a lengthy biological half-life and a pronounced effect on the heart.

Pfizer further responds that there have been and continue to be widespread attempts to copy the embodiment of the '600 patent commercialized as Detrol®/Detrusitol®.  By filing its Abbreviated New Drug Application No. 76-953, Teva seeks approval to market a generic version of embodiment of the '600 patent commercialized as Detrol® in the United States.

### Supplemental Response to Interrogatory No. 12

Pfizer objects to this Interrogatory insofar as it calls for legal conclusions as to secondary indicia of nonobviousness.  To the extent that this Interrogatory calls for the substance of legal advice and/or opinions as to the nonobviousness of the claims of the '600 patent, Pfizer objects

to this Interrogatory as calling for information protected by the attorney-client privilege and work product doctrine. Pfizer further objects to this Interrogatory as comprising at least ten (10) interrogatories and states that it should be treated as such. Pfizer further objects to this Interrogatory to the extent that Teva purports to define or limit the nature of secondary considerations in support of which Pfizer may provide evidence. Subject to and without waiving the foregoing general and specific objections, Pfizer responds as follows.

Pfizer responds that an embodiment of the invention claimed in the '600 patent, tolterodine, is commercialized in the United States under the trade names Detrol® and Detrol® LA, and in Europe under the trade names Detrusitol® and Detrusitol® XL. Pfizer's *tolterodine* products are the most prescribed pharmaceuticals for treatment of overactive bladder in the world, and sales of Detrol® and Detrol® LA have grossed billions of dollars in sales since 1998 in the United States alone. There exists a nexus between the invention claimed in the '600 patent and the commercial success of Pfizer's *tolterodine* products. Sales of Pfizer's *tolterodine* products remain strong despite subsequent entry into the market of competitive therapies. See, e.g., PFZ 278461 – PFZ 278880.

Pfizer further responds that the invention claimed in the '600 patent met a long felt but unsolved need in the field of urinary incontinence, as evidenced, among other things, by the facts that, at its launch, Detrol® was the first new medication approved for a bladder control problem in the United States in more than 20 years, and that Pfizer's *tolterodine* products have sold as well as they have.

Pfizer further responds that, by the embodiment of the invention claimed in the '600 patent presently commercialized as Detrol®/Detrusitol®, the named inventors had succeeded where others had previously failed. Specifically, the invention gave rise to a safe urinary

-5-

incontinence treatment having considerably fewer side effects caused by a lack of selectivity, dry mouth in particular, than bladder control products in existence prior to and at the time of the approvals of Detrol®/Detrusitol®. For example the compound, terodiline, which is disclosed in the '600 patent, had been shown to treat urinary incontinence but was not commercially viable due to a lengthy biological half-life and a pronounced effect on the heart. In addition, Teva's and IVAX's difficulties, including technical difficulties, in obtaining even tentative approval of their respective *tolterodine* ANDAs is further evidence of the failure of others.

Pfizer further responds that there have been and continue to be widespread attempts to copy an embodiment of the invention claimed in the '600 patent. By filing its Abbreviated New Drug Application No. 76-966, Teva sought approval to market a generic version of an embodiment of the invention claimed in the '600 patent. By filing its Abbreviated New Drug Application No. 76-953, Ranbaxy seeks approval to market a generic version of an embodiment of the invention claimed in the '600 patent. By filing its Abbreviated New Drug Application No. 77-006, IVAX seeks approval to market a generic version of an embodiment of the invention claimed in the '600 patent. To the extent that Teva, IVAX, or others have undertaken development with respect to a generic version of Pfizer's Detrol® LA product, that would also be evidence of copying an embodiment of the '600 patent.

Pfizer further responds that there has been praise for the invention claimed in the '600 patent. For example, *tolterodine*, an embodiment of the invention claimed in the '600 patent, has been described as an "important urological drug." See IVAX 3949-67.

Pfizer further responds that evidence of unexpected results is present in, at a minimum, information submitted to the United States Patent and Trademark Office as part of the

applications that led to the '600 patent. Such information includes data in Table 1 of the '600 patent.

### Interrogatory No. 26

Identify by study number, title, and date all clinical studies, including Phase IV studies, of tolterodine tartrate, Detrol and Detrol LA that Pfizer conducted or that were conducted on its behalf after December 1997, and identify by Bates number all documents produced by Pfizer that describe, evidence, contain the results of or refer to such clinical trials.

### Response to Interrogatory No. 26

Pfizer objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information unrelated to the validity and/or enforceability of any asserted claim of the '600 Patent. Pfizer further objects to this Interrogatory as vague and ambiguous to the extent that it employs the terms "reflect," "describe," "evidence," and "refer to." Pfizer also objects to this Interrogatory as improperly seeking a legal conclusion insofar as it employs the term "evidence." Subject to and without waiving the foregoing general and specific objections, Pfizer responds as follows.

Pfizer responds, pursuant to Fed. R. Civ. P. 33(d), that information responsive to this Interrogatory may be derived from at least the following documents that Pfizer has produced to Teva in this case:

```
PFZ 120594 – PFZ 120604;
PFZ 120605 – PFZ 120616;
PFZ 120617 – PFZ 120631;
PFZ 120663 – PFZ 120680;
PFZ 120692 – PFZ 120701;
PFZ 120736 – PFZ 120747;
PFZ 120748 – PFZ 120762;
PFZ 120890 – PFZ 120902;
```

Dated: September 14, 2007
New York, New York

By: _____
Dimitrios T. Drivas
Jeffrey J. Oelke
Adam Gahtan
James S. Trainor, Jr.
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

David E. De Lorenzi
Sheila F. McShane
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4743
Facsimile: (973) 639-2335

*Attorneys for Plaintiffs and Counterclaim-Defendants Pfizer Inc., Pharmacia & Upjohn Company, and Pfizer Health AB*

# EXHIBIT 3



SHEILA F. MCSHANE
Associate

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4637 Fax: (973) 639-6482
smcshane@gibbonslaw.com

**CONFIDENTIAL INFORMATION ATTACHED THAT
IS SUBJECT TO THE TERMS OF THE PROTECTIVE
ORDER ENTERED IN THIS ACTION**

October 1, 2007

**VIA HAND DELIVERY**

The Honorable Mark Falk
United States Magistrate Judge
United States District Court
U.S.P.O. & Courthouse
One Federal Square
Newark, New Jersey 07101

Re:   **Pfizer Inc., _et al._ v. Ivax Pharmaceuticals, Inc., C.A. No. 07-0174**

Dear Judge Falk:

We represent Plaintiffs and Counterclaim-Defendants Pfizer Inc., Pharmacia & Upjohn

Company, and Pfizer Health AB (collectively, "Pfizer"). On August 22, 2007 and September 10,

2007, the parties briefed Pfizer's motion to compel Defendants and Counterclaim-Plaintiffs

IVAX Pharmaceuticals, Inc. ("IVAX") and Teva Pharmaceuticals USA, Inc. ("Teva") to produce

documents related to Detrol® LA, one of two _tolterodine_ formulations that Pfizer markets for the

treatment of overactive bladder. During a September 19, 2007 teleconference on the matter,

Your Honor agreed that additional information, particularly about the extent to which Detrol®

LA has been the subject of discovery and expert opinion, might help the Court resolve the issue.

We provide that additional information here, in proper legal context, and, for Your Honor's

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 2

convenience, we attach the original letter briefs as Exhibit A to this submission. Pfizer will not

repeat the background and original arguments here.

A review of earlier discovery and expert reports, and of straightforward patent law,

makes plain that (a) Detrol® LA has been the subject of extensive attention throughout this

dispute in connection with secondary considerations of non-obviousness, (b) the law requires

IVAX, which was not subject to discovery in the Teva Action, to produce the requested

information, and (c) because IVAX and Teva rely on Detrol® LA information to attempt to

invalidate Pfizer's U.S. Patent No. 5,382,600 (the "'600 patent"), that Pfizer will be prejudiced in

its attempt to defend its valuable property from Teva/IVAX's attack should the Court deny

Pfizer's motion. Pfizer does not seek to "redo" discovery that could have been taken in the Teva

Action, but rather seeks discovery of new party IVAX, and non-duplicative discovery of Teva,

consistent with this Court's Pretrial Scheduling Order. Moreover, there is no undue burden on

Teva and IVAX to provide the requested discovery. Not only should they have produced the

requested information in the first place, but, based on Teva and IVAX's counsel's

representations, the majority of responsive documents should already be in Teva and IVAX's

possession, in electronic format, and need only be reproduced in a less redacted form.

A.    **Detrol® LA Was a Substantial Part of Discovery in the Teva Action**

During the teleconference on September 19, Teva and IVAX represented to the Court that

the parties had not engaged in discovery with respect to Detrol® LA in the Teva Action.

Contrary to Teva's assertions, Detrol® LA was the subject of extensive mutual documentary and

other fact discovery, as well as expert opinion, in the Teva Action.

#1231847 v1
070370-58973

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 3

### 1.    Teva Requested and Pfizer Provided Fact Discovery on Detrol® LA

Teva's first document requests to Pfizer, dated July 13, 2004, included no fewer than nine

requests that expressly sought information related to Detrol® LA.  (Excerpt attached as Ex. B,

Request Nos. 32-33, and 35-41.)  Teva's requests sought information related to, among other

things, the sales, marketing, and pricing of Detrol® LA – information that relates to commercial

success.  For example, Teva's requests included the following:

> All documents concerning sales forecasts or strategies, marketing forecasts or strategies,
> or profit or revenue forecasts or strategies, for any of PFIZER's products or methods that
> are disclosed in or encompassed by the claims of the '600 patent, including, without
> limitation, sales of the Detrol® LA product.  (Request No. 36, emphasis added)

> All documents concerning pricing or pricing strategies for any of PFIZER's products or
> methods that are disclosed in or encompassed by the claims of the '600 patent, including,
> without limitation, sales of the Detrol® LA product.   (Request No. 37, emphasis added)

In response to Teva's requests, Pfizer produced tens of thousands of pages of documents related

to Detrol® LA, including the sales and marketing information that Teva requested, publications

related to clinical studies on Detrol® LA, as well as CDs and videos.  In the present action,

consistent with its ongoing obligations, Pfizer has supplemented that production to include

updated sales information and recently published articles related to Detrol® LA.

Teva also sought deposition testimony on the Detrol® LA product.   Teva's first

deposition notice of Pfizer, pursuant to Fed. R. Civ. P. 30(b)(6), dated January 27, 2005,

included no fewer than four topics that expressly sought information on both Detrol® and

Detrol® LA.  (Excerpt attached as Ex. C, Topic Nos. 11, 16, 19, and 23.)  In particular, Teva

sought information that related to the commercial success of that product, such as sales figures,

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 4

potential competitors, and costs related to the development and manufacture of the Detrol® LA

product. (Id.)  Teva's topics included the following:

> Annual, quarterly and monthly sales, revenues, and profits of Detrol® and Detrol® LA,
> in dollars and units, from the first sale of Detrol® and Detrol® LA to the present.  (Topic
> No. 19)

> Any evaluation, analysis, or consideration of any actual or potential competitors of
> Detrol®, Detrol® LA, or tolterodine tartrate, including any analysis of the physical
> characteristics of any competitors, the strengths or weaknesses of any competitors, the
> market for any competitors, marketing for any competitors, and any actual or projected
> sales of any competitors.  (Topic No. 23)

Teva's questions of James Sage, Pfizer's 30(b)(6) designee, related to the sales and marketing of

the Detrol® LA product, as well as to clinical studies of that product.

Teva also sought information concerning "clinical studies, including Phase IV studies, of

*tolterodine tartrate*, Detrol and Detrol LA" through interrogatories.  (Excerpt attached as Ex. D,

Interrogatory Nos. 26 and 27, emphasis added.)  Pfizer responded to those interrogatories, and,

as set forth below, provided a supplemental response to interrogatory no. 26 in the present action.

## 2. Pfizer Requested and Teva Provided Discovery on Detrol® LA

Pfizer propounded, and Teva responded to, interrogatories and requests for admission in

the Teva Action that related specifically to Detrol® LA and secondary considerations.  For

example, Pfizer served an interrogatory seeking information concerning the "commercial success

of Detrol® and/or Detrol® LA."  (Excerpt attached as Ex. E, Interrogatory No. 23.)  Teva

responded to that interrogatory, without objecting that it concerned Detrol® LA.  (Id.)  Pfizer

also served requests for admission related to secondary considerations of non-obviousness,

including commercial success and copying, with respect to Detrol® LA.

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 5

Teva also provided documents about Detrol® LA. The information provided included

Detrol® LA sales and marketing data and clinical and other publications. (See, e.g., Ex. F,

TTOLT 8495-96, 8507-08, 8730-31.) Teva has not supplemented its production with respect to

Detrol® LA in the present action, and IVAX has not produced any unredacted documents related

to Detrol® LA.[1]

Finally, as Teva and IVAX admit in their September 10 opposition letter, Pfizer asked

three of Teva's five fact witnesses, Phillip Erickson, Karen Feldtmose, and Anne Payne,

questions about Detrol® LA. (Ex. A, Teva and IVAX's September 10, 2007 Letter to Magistrate

Judge Falk, n.1.)

### 3.    Detrol® LA Was the Subject of Expert Opinion

Finally, both parties provided expert opinion related to Detrol® LA, and, specifically,

how Detrol® LA factors into secondary considerations of non-obviousness. Pfizer's expert

urologist Dr. Rodney Appell submitted a report that addressed secondary considerations,

including specifically commercial success. (Expert Report of Rodney A. Appell, M.D. (without

exhibits), Ex. G.) Dr. Appell's opinions expressly included both Detrol and Detrol® LA. (See,

e.g., id. at ¶¶ 17, 65.) Teva submitted the opinion of Dr. Keith Leffler, purportedly in rebuttal to

Dr. Appell's report, that also specifically addressed commercial success (Expert Report of Keith

B. Leffler, Ph.D., Ex. H at 2.) Dr. Leffler's report relies on information about Detrol® LA that

Pfizer produced in response to Teva's requests (see, e.g., id. at 19), as well as on information that

---

[1] Other than Teva's FDA correspondence related to its now-withdrawn *tolterodine* ANDA, IVAX and Teva have jointly produced documents in this action, bates-stamped "IVAX," although many of the produced documents appear to have been created at Teva prior to its acquisition of IVAX.

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 6

Dr. Leffler found himself. Dr. Leffler claims to have reviewed hundreds of pages of documents related to Detrol® LA, produced by both Pfizer and Teva, in preparing his report (id. at Ex. B), the goal of which is to assist Teva in its attempt to invalidate Pfizer's patent.

Given the extent of both parties' Detrol® LA-related requests in the Teva Action, and in particular Teva's expert's reliance on such information, it is too late for Teva or IVAX to pretend that the information is not relevant, or, as Pfizer addresses below, that Detrol® LA represents some sort of new theory. Pfizer does not seek to duplicate the discovery taken in the Teva Action, but, rather, to obtain supplemental responses from Teva, as required by the Pretrial Scheduling Order. Pfizer also seeks to obtain similar discovery from IVAX, an entirely new party that was not subject to discovery in the Teva Action.

### B.    Detrol® LA Does Not Form the Basis of a New Secondary Considerations Theory

On September 14, Pfizer supplemented its responses to two of Teva's interrogatories from the Teva Action, pursuant to the Pretrial Scheduling Order, and as was its obligation under Federal Rule of Civil Procedure 26(e)(2). One of those interrogatories, no. 12, sought information concerning secondary considerations of non-obviousness with respect to the '600 patent. Pfizer's original response clearly included commercial success information, including sales figures, and also clearly referenced the entire *tolterodine* franchise, as indicated by the sales figures cited therein, which, as Teva and IVAX are surely aware, are largely attributable to Detrol® LA. Pfizer's supplemental response in this regard merely added the trade names for

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 7

long-acting formulations of *tolterodine*, including Detrol® LA, and also included the Bates range

for the most recently produced *tolterodine* sales figures.

 As evidenced by the extensive fact and expert discovery concerning Detrol® LA in the

Teva Action, set forth above, including Pfizer's original interrogatory response, Pfizer has long

signaled its intention to rely on information related to Detrol® LA, if necessary, to defend

against Teva's invalidity attack on the '600 patent.  Pfizer continuously provided information on

commercial success and other secondary considerations through document production,

deposition testimony, and expert opinion, and, as <u>Teva's</u> expert's reliance on Detrol® LA

information demonstrates, Teva clearly understood that Detrol® LA was part of the secondary

considerations case.  In light of its extensive production of documents and other Detrol® LA

information, there was nothing remotely surprising about Pfizer's supplementation of its

interrogatory response.  Moreover, Teva and IVAX have themselves recently taken the position

that there is "no obligation to immediately supplement interrogatory responses when the

additional information has been otherwise disclosed… during the discovery process."

(September 11, 2007 Letter from D. Kennedy to A. Gahtan, Ex. I, p.1.)

 Teva's feigned surprise about Pfizer's inclusion of Detrol® LA information in its

interrogatory response is particularly disingenuous given that, at the same time Pfizer

supplemented its response to Teva's interrogatory no. 12, Pfizer also supplemented its response

to Teva's interrogatory no. 26.   Teva's interrogatory no. 26 expressly seeks information on the

Detrol® LA product.  In short, Teva seeks to rely on Detrol® LA information to attack Pfizer's

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 8

patent, while at the same time preventing Pfizer from relying on such information to defend

itself.

## II.   PFIZER'S DISCOVERY REQUESTS ARE REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE

The information that Pfizer seeks is relevant to one of the primary issues to be resolved in

this action.  Teva and IVAX allege that the '600 patent is invalid as obvious under 35 U.S.C. §

103.  To answer the obviousness question, this Court will have to consider any secondary

considerations of non-obviousness with respect to the '600 patent claims at issue.  Specialty

Composites v. Cabot Corp., 845 F.2d 981, 989-90 (Fed. Cir. 1988) (citing Graham v. John Deere

Co., 383 U.S. 1, 17-18 (1966)).  According to the Federal Circuit, "evidence of secondary

considerations may often be the most probative and cogent evidence in the record." Ruiz v. A.B.

Chance Co., 234 F.3d 654, 667 (Fed. Cir. 2000) (citation omitted, emphasis added).  The

relevant secondary considerations here include at least commercial success.  Glaxo Group Ltd. v.

Apotex, Inc., 376 F.3d 1339, 1349 (Fed. Cir. 2004) (identifying commercial success as one in

catalog of secondary considerations).

Pfizer has asserted infringement of claims 4 and 6 of the '600 patent.  By stipulating to

infringement, Teva and IVAX have admitted that the asserted claims cover *tolterodine tartrate*,

the active ingredient in both Detrol® and Detrol® LA.  They contend, however, for the first time

in the parties' *tolterodine* litigation, that because their obviousness claims relate to non-

*tolterodine* compounds in claims 4 and 6, and not to *tolterodine* itself, information concerning

the commercial success of Detrol® LA, a *tolterodine* product, is not relevant to the obviousness

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 9

analysis and should not be subject to discovery. Pfizer is aware of no case that supports this position, which in effect would give the party challenging the patent the ability to prevent the patentee from defending itself. In fact, it is established Federal Circuit case law that the commercial success of <u>any</u> product covered by a patent claim may be advanced by a patentee to rebut a challenge on obviousness grounds. <u>Gambro Lundia AB</u> v. <u>Baxter Healthcare Corp.</u>, 110 F.3d 1573, 1579 (Fed. Cir. 1997). It is undisputed that Detrol® LA is covered by the patent claims in dispute, and is thus relevant in this case as a matter of law.

## III.    DISCOVERY IS NOT UNDULY BURDENSOME AND COSTLY

Finally, IVAX and Teva assert that "compelling Teva and IVAX to produce documents that may exist concerning Detrol® LA would be unduly burdensome and extremely costly." (Ex. A, Teva and IVAX's September 10, 2007 Letter to Magistrate Judge Falk, p 3.) In so arguing, Teva would have the Court ignore the burden and expense that Pfizer has undertaken to re-litigate as a result of Teva's questionable withdraw-and-swap ANDA tactics, which Teva admits were employed in an effort to hold its place in the Court's trial queue. Teva and IVAX argue that un-redacting previously withheld information will be a source of cost and burden. Such information was responsive to Pfizer's discovery requests in the first place, and IVAX and Teva should not have redacted it. Had they provided the information initially, they could have avoided the additional time and expense. Moreover, given that the vast majority of responsive documents appear to already be in the possession of Teva and IVAX's counsel, in electronic format, Teva and IVAX's reproduction of those documents in a less redacted form cannot be considered an undue burden.

#1231847 v1
070370-58973

GIBBONS P.C.

The Honorable Mark Falk
October 1, 2007
Page 10


IVAX and Teva have chosen to challenge the validity of the '600 patent in hopes of

entering the billion-dollar *tolterodine* market.   Pfizer must be permitted to fully defend itself

against that challenge.

## **CONCLUSION**

For the reasons above, Pfizer respectfully requests that this Court compel IVAX and Teva

to produce documents concerning long-acting formulations of *tolterodine*, including Detrol®

LA.



Respectfully Submitted,

Sheila F. McShane


Encl.

cc:    Michael Patunas, Esq. (via e-mail)
       Don M. Kennedy, Esq. (via e-mail)
       Jeffrey J. Oelke, Esq. (via e-mail)

# EXHIBIT 4

<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT NEW JERSEY
 2
     PFIZER, INC.,                    )
 3                                    )
                      Plaintiff,      )
 4                                    )
          vs.                         )   No. 07-cv-174
 5                                    )
     IVAX PHARMACEUTICALS, INC.,      )   Newark, New Jersey
 6                                    )   November 9, 2007
                      Defendant.      )
 7

 8                     TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE MARK FALK
 9                    UNITED STATES JUDGE

10   APPEARANCES:

11   For the Plaintiff:          By:  SHEILA MCSHANE
                                 GIBBONS, PC
12                               One Gateway Center
                                 Newark, New Jersey 07102
13
                                 By:  JAMES TRAINOR
14                               WHITE & CASE LLP
                                 1155 Avenue of the Americas
15                               New York, New York 10036-2787

16                               By:  ADAM GAHTAN
                                 WHITE & CASE LLP
17                               1155 Avenue of the Americas
                                 New York, New York 10036-2787
18
     For the Defendant:          By:  ALLYN LITE
19                               LITE DEPALMA GREENBERG & RIVAS
                                 Two Gateway Center, 12th Floor
20                               Newark, NJ 07102-5003

21                               By:  Mayra Tarantino
                                 LITE DEPALMA GREENBERG & RIVAS
22                               Two Gateway Center, 12th Floor
                                 Newark, NJ 07102-5003
23
     Audio Operator:             KING TRANSCRIPTION SERVICES
24                               65 Willowbrook Boulevard
     Transcription Company:      Wayne, New Jersey 07470
25                               (973) 237-6080

     Proceedings recorded by electronic sound recording, transcript
     produced by transcription services.
</pre>

1                                      INDEX

2

3    The Court                                                    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                3

1               November 9, 2007

2               THE COURT:  This is the case of <u>Pfizer v. Ivax</u>.  It

3       is docket number 07174.  Can I have the appearances of counsel,

4       please?

5               MISS MCSHANE:  Morning, Your Honor.  My name is

6       Sheila McShane.  I'm with Gibbons representing plaintiff,

7       Pfizer, and with me are Jim Trainor and Adam Gahtan of White

8       and Case, also representing Pfizer.

9               THE COURT:  Morning.

10              MISS TARANTINO:  Good morning, Your Honor.  Mayra

11      Tarantino from Lite DePalma Greenberg and Rivas representing

12      defendants Ivax and Teva, and with me are Don Kennedy and

13      Elaine Blais of Goodwin Procter.

14              THE COURT:  All right --

15              MR. KENNEDY:  Good morning, Your Honor.  Allyn Lite

16      from Lite DePalma Greenberg and Rivas, also for Ivax, and I

17      appreciate you allowing me to participate by phone.

18              THE COURT:  No problem.  Okay, I think that -- just

19      bear with me one second, let me get some papers in line.  Just

20      in terms of the status of the case, my review of the last

21      scheduling order that we had in this case, we had dates of

22      September 14th for the close of fact discovery, expert reports

23      due October 12th, responding expert reports November 2nd, close

24      of expert discovery November 26th, and summary judgment motions

25      to be submitted by December 17th.  Is there any other order

1    going to pursue the IR product rather than the extended release

2    product.  It would be a surprising result.  I think they had

3    plenty of notice that the ultimate target might be the extended

4    release produce, and they simply choose not to further pursue

5    discover on that point.

6              MR. TRAINOR:  Can I just respond to that, Your Honor?

7              THE COURT:  Sure.

8              MR. TRAINOR:  For a generic company, the target

9    product might be any branded product that's on the market.  We

10   asked the question point blank to one of their witnesses, do

11   you intend to file a paragraph four on Detrol LA, and their

12   attorneys would not allow them to answer that question.  So --

13   and, again, that was what I was referring to when we said the

14   only time we affirmatively were on notice that we weren't

15   getting this information is when we got into an area that was

16   potentially privileged and we respected that.

17             MR. KENNEDY:  If they really thought it was relevant,

18   Your Honor, why did they respect it?  Why didn't they move?  I

19   mean --

20             THE COURT:  You know, keep in mind folks that I have

21   a relatively narrow discovery dispute before me with a very

22   limited record.  I asked for more information; I got more

23   information.  You are referring to many things that we have

24   nothing before us.  I understand what's really going on here

25   and how important it is to the parties.

1        It seems to me that it's -- there's a lot of

2   strategic positioning and maybe with good reason.  I must say

3   that having gone through the papers that I have received there

4   are many inconsistencies in both parties' positions.  But the

5   ultimate question is a discovery question for the Court, I

6   guess addressing the issue of relevance first.

7        I agree with counsel who argued that there ultimately

8   is a relevance issue as to this information regarding Detrol LA

9   in the context of this patent dispute, which presumably will be

10  resolved by the trial judge.

11       I certainly find, based on what has been submitted,

12  that information regarding Detrol LA is relevant in a discovery

13  context to the issue of commercial success, which of course

14  goes to negate obviousness, and obviousness is really, I

15  suppose, one of the central issues in the case -- the validity

16  of the patent or of particular claims.  So I think that Detrol

17  LA is -- discovery regarding it is relevant.

18       Second, it's all over the case.  It's mentioned in

19  the expert reports that have been submitted.  There were many

20  discovery requests by Teva regarding it, some discovery

21  requests by Pfizer.  Pfizer has only shown or only attached the

22  one interrogatory, but counsel has stated here that there were

23  many document requests on the subject of Detrol LA.

24       And it's being discussed at all times, and it's

25  there.  It's in the case, and I have no problem with discovery

1    going both ways on that subject.  Of course, this case comes to

2    us with a somewhat interesting procedural background, and

3    indeed there was much negotiation in the entry of an order by

4    this Court on March 29th, 2007, which made certain provisions

5    for using all of the discovery from the earlier case in this

6    case and had certain limitations on new discovery.  As the

7    order -- the final order, the primary limitation was more on --

8    as its written -- on Teva and Ivax from propounding new

9    discovery unless it was in response to new, legitimate

10   discovery propounded by Pfizer.

11           I must say I'm troubled by the position taken by

12   Pfizer that its certified answers to interrogatories or to

13   document requests are just what lawyers do.  It is true that

14   lawyers make objections and may object that something is overly

15   broad, etcetera, and I understand that -- or unduly burdensome

16   -- I understand that.  But these responses go further and state

17   "Not reasonably calculated to lead to the discovery of

18   admissible evidence to the extent that it seeks documents

19   concerning the Detrol LA product, which is not the subject of"

20   == and it goes on -- "the NDA to which Teva's ANDA refers."

21           That is an affirmative statement.  I think there are

22   consequences that attach to that statement.  I think if you

23   look closely at the federal rules, you'll find that when a

24   lawyer responds to interrogatories or a document request, that

25   is tantamount to a certification of certain things; for example

1    that a serach for documents was made, etcetera.

2            And similarly, when a lawyer makes a statement like

3    that and that stays out there -- presumably that was never

4    revised -- I think one could make an argument that an adverse

5    party has a right to rely on that.  Of course, none of this was

6    briefed, and none of this is really party of it.  But we have a

7    situation where, on the day that discovery was to close in this

8    case, September 14th, 2007, Pfizer supplemented its responses

9    to Teva's interrogatories 12 and 26 by including information

10   going right to the issue of Detrol LA as the basis for a

11   commercial success argument.

12           So I guess the bottom line is I don't find anything

13   in my order which precludes this discovery.  I cannot tell

14   whether it's new discovery or duplicated discovery.  It may be

15   both.  The parties have not given me the information to make

16   that kind of a decision.  In any event, I think it's important

17   and well established that cases should be decided on their

18   merits, and I -- from reading everything I've seen -- I think

19   that discovery on the commercial success aspect of Detrol LA is

20   something that is a proper subject for discovery.

21           Now, having said that, I believe -- and we'll have to

22   talk scheduling -- but I believe that there should be a

23   shifting of costs in this particular case.  I'm troubled, as I

24   stated, by taking position that something is not relevant and

25   on the last day of discovery changing that position.  There's

1    nothing in my order that said a party can't change a position,

2    but I think that there are consequences that should go with it.

3    Certainly the scope and conduct of discovery are within the

4    sound discretion of the Court, and this includes substantial

5    discretion in the allocation of costs and discovery.  Costs are

6    generally paid by the responding party.  A showing of other

7    good causes, Courts can deviated from that rule, and that's

8    right in rule 26(c)2.   There's a lot of law on the subject.

9              Now none of this was briefed before me, and I'm not

10   sure what's involved.  One side has taken the position that it

11   will be a very difficult and expensive proposition to go

12   through the, what is it, 14,000 or so pages.  I don't remember

13   the exact number of redactions.  Was it 13,000?  I don't

14   remember the exact number.

15             MR. KENNEDY:  It's in the low five figures, Your

16   Honor?

17             THE COURT:  Pardon me.

18             MR. KENNEDY:  It's in the low five figures, Your

19   Honor.  It's --

20             THE COURT:  Pardon me.

21             MR. KENNEDY:  It's in the low five figures like that.

22             THE COURT:  Right, and then the other side is taking

23   the position that these things were done electronically so that

24   the unredaction of that is a very simple piece of business.  So

25   I'm not gonna make any specific finding now, but it is my

Colloquy                                                    32

1   intention to have at least partial cost shifting on the -- this

2   aspect of the discovery.  But the more important issue is I do

3   want to move the case forward.  I think one could look at this,

4   at what has happened here, as an attempt to delay things.  One

5   could do that.  I can't make that decision.

6           But it's my intention to have this be done

7   expeditiously and, frankly, I'm gonna give the parties an

8   opportunity to confer.  Maybe you should confer right now, and

9   I'll leave the bench and then you can let me know what you

10  think in terms of scheduling.  Do we have anything else out

11  there?  No?

12          MISS MCSHANE:  No, Your Honor.

13          THE COURT:  Okay, thank you.

14                      (Proceeding concluded)

15

16

17

18

19

20

21

22

23

24

25

33

1

2

3

4                              Certification

5    I, Jill Campbell, Court approved transcriber, certify that the

     foregoing is a correct transcript from the official electronic

6    sound recording of the proceedings in the above-entitled

7    matter.

8

9

10   _____    November 13, 2007

11   Signature of Approved Transcriber         Date

12

13   Jill Campbell, CET**D-298
     King Transcription Services
14   65 Willowbrook Boulevard
     Wayne, NJ 07470
15   (973 237-6080)

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
MasterCard International, Inc. v. Lexcel Solutions, Inc.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
MASTERCARD INTERNATIONAL
INCORPORATED and Mastercard International,
LLC, Plaintiffs,
v.
LEXCEL SOLUTIONS, INC., Defendant.
**No. 03 Civ.7157(WHP).**

June 16, 2004.

Robert C. Scheinfeld, Eliot D. Williams, Baker Botts LLP, New York, NY, for plaintiffs.
Michael O. Sutton, Nathan Dunn, Locke, Liddell & Sapp, LLP, Houston, TX, for defendant.

*MEMORANDUM and ORDER*
PAULEY, J.
**\*1** Plaintiffs MasterCard International Inc. and MasterCard International, LLC (collectively, "MasterCard") bring this action for a declaratory judgment of non-infringement and invalidity of defendant Lexcel Solutions Inc.'s ("Lexcel's") patents for an electronic funds transfer network test system, U.S. Patent No. 6,129,271, and U.S. Patent No. 6,336,590. Lexcel moves to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, and alternatively moves to transfer this action to the District of Arizona, pursuant to 28 U.S.C. § 1404(a). For the reasons stated below, Lexcel's motion to dismiss is denied, and its motion to transfer venue is granted.

*BACKGROUND*

This action stems from the deterioration of a relationship between parties to a software license agreement. Lexcel sells and licenses software called "financial transaction network testing and simulation software" to test financial transaction systems, such as electronic funds **transfer** systems. (Compl.¶ 8.) MasterCard operates financial transaction networks and supplies testing and simulation software to its member financial institutions to allow them to verify that their systems will operate with MasterCard's financial transaction networks. (Compl.¶ ¶ 9-10.) Until April 2003, MasterCard licensed this testing and simulation software from outside vendors, including Lexcel. (Compl.¶ 11.) In collaboration with another vendor, MasterCard is developing network testing and simulation software for distribution to its associated financial institutions. (Compl. ¶ 15; Supplemental Declaration of Simon Dix, dated November 24, 2003 ("Dix Decl. II.") ¶ ¶ 2-5.) As a result, Lexcel filed suit against MasterCard in the District of Arizona on July 29, 2003, (the "Arizona Action") claiming breach of contract, misappropriation of trade secrets, unfair competition, copyright infringement and breach of fiduciary duty. (Compl. ¶ 12; Declaration of Nathan Dunn, dated Oct. 30, 2002 ("Dunn Decl.") Ex. F: Lexcel Arizona Complaint.) The Arizona Action concerns the **sametechnology** and products at issue here. (Transcript of Oral Argument, dated December 5, 2003 ("Tr.") at 11; Compl. ¶ 12; Dunn Decl. Ex. F.) Specifically, Lexcel alleges in the Arizona Action that MasterCard improperly accessed the confidential source code of Lexcel's financial network testing software. (Dunn Decl. Ex. F ¶ ¶ 11-18, 23, 25, 34, 37, 40, 43.) On August 15, 2003, MasterCard answered and counterclaimed for breach of a license agreement in that action. (Dunn Decl. Ex. C: MasterCard Arizona Answer and Counterclaim.)

On September 4, 2003, Lexcel's counsel advised MasterCard's counsel in the context of a compromise negotiation that Lexcel might have a claim for patent infringement against MasterCard for "infringement that may occur in the future or that may have already occurred."(Compl. ¶ 13; Dunn Decl. Ex. B at 2.) Further, during an "in-person meeting between MasterCard and Lexcel personnel subsequent to the filing of the Arizona Action, Lexcel personnel allegedly told MasterCard that Lexcel owned at least two government-issued U.S. patents, and suggested that the existence of those patents would prevent MasterCard from pursuing alternate sourcing of network testing and/or simulator software other than from Lexcel without facing a lawsuit from Lexcel."(Compl.¶ 14.)

**\*2** MasterCard filed this action on September 12, 2003, alleging that it is entitled to a declaratory judgment of patent non-infringement and invalidity, and a finding that Lexcel's patents are unenforceable because: (a) both MasterCard and Visa publically

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

used their own versions of financial transaction network testing or simulation software before Lexcel applied for its patents; and (b) Lexcel intentionally failed to disclose prior art to the United States Patent and Trademark Office ("PTO") during prosecution. (Compl.¶ ¶ 17-39.) The underlying facts of the parties' dispute are nearly identical to those of the Arizona Action. (Dunn Decl. Ex. F ¶ ¶ 11-18; Compl. ¶ ¶ 8-16.) On December 3, 2003, two days before oral argument on this motion, this Court received notice from Lexcel that it moved to amend its complaint in the Arizona Action to add, *inter alia*, a "conditional" patent infringement claim. (Lexcel Supplemental Submission, dated December 3, 2003; Joint Status Letter to the Court, dated May 14, 2004 ("Joint Letter") at 2.) On May 28, 2004, the Arizona federal district court denied Lexcel's motion to amend its complaint to include a "conditional proposed count" of patent infringement because: (1) Lexcel's conditional amendment failed to satisfy the standards of Fed.R.Civ.P. Rule 8; and (2) Lexcel's conditional request failed to demonstrate that an actual case or controversy existed. *Lexcel Solutions, Inc. v. MasterCard, Inc.,* CV-03-1454-PHX-JAT (D.Ariz. May 28, 2004).

## DISCUSSION

### I. *Rule 12(b)(1) Standards*

On a Rule 12(b) motion to dismiss, this Court generally must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *accordLeatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 1161 (1993) (noting that factual allegations in the complaint must be accepted as true on motion to dismiss); *Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 128 (2d Cir.2000) (same). In order to avoid dismissal, a plaintiff must assert a cognizable claim and allege facts that, if true, would support such a claim.*Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997).

Under a Rule 12(b)(1) challenge to a court's subject matter jurisdiction, the disputed jurisdictional fact issues may be resolved by referring to evidence outside of the pleadings, such as affidavits, and if necessary, an evidentiary hearing. *SeePhifer v. City of New York,* 289 F.3d 49, 55 (2d Cir.2002); *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000).

### II. *Declaratory Judgment Act*

MasterCard asserts subject matter jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 (2003) and the federal patent laws, pursuant to 28 U.S.C. § 1338(a) (2003). (Compl.¶ 5.) Lexcel argues that this Court should dismiss the complaint for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1) because an actual controversy does not exist. Interpreting the Declaratory Judgment Act, 28 U.S.C. § 2201, the Federal Circuit has established a two-pronged test to determine if there is a justiciable controversy in a declaratory judgment action concerning patent law. A declaratory judgment plaintiff must show that, as of the time the complaint was filed: (1) the defendant's conduct "created on the part of plaintiff a reasonable apprehension that the defendant [would] initiate suit"; and (2) the plaintiff either produced or had taken steps to produce the accused device.*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988); *Shell Oil Co. v. Amoco Corp.,* 270 F.2d 885, 888 (Fed.Cir.1992).

*3 A plaintiff may establish an objective reasonable apprehension of suit through evidence of a defendant's express charge of infringement or through a totality of the circumstances. *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 96 (1993); *Shell Oil,* 270 F.2d at 888;*Arrowhead,* 846 F.2d at 734-36. "To invoke the court's declaratory judgment jurisdiction, a plaintiff must show 'more than the nervous state of mind of a possible infringer,' but does not have to show that the patentee is 'poised on the courthouse steps.' ' *Vanguard Research, Inc. v. PEAT, Inc.,* 304 F.3d 1249, 1255-56 (Fed.Cir.2002) (citations omitted). Finally, even if there is an actual controversy, a court still retains discretion to decline jurisdiction.*E.M.C. v. Normand Corp .,* 89 F.3d 807, 813 (Fed.Cir.1996).

### A. *Reasonable Apprehension*

Lexcel contends that its conduct did not create a reasonable apprehension that it would initiate a patent suit against MasterCard because: (a) it did not make

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

an express charge of infringement against MasterCard; (b) its complaint in the Arizona Action does not allege a patent claim that could have been easily included; (c) it had not begun an investigation into pursuing a patent infringement action; and (d) the statements to which MasterCard points in support of the existence of a reasonable apprehension were made in the context of settlement negotiations and do not indicate a threat of litigation. Lexcel does not dispute that it engaged in discussions with MasterCard concerning its patents, but instead characterizes those communications as "pure positional statement[s]," "jawboning," or "a reservation of rights" in order to minimize the likelihood of a finding of reasonable apprehension of suit. (Def. Br. at 5-6.) As noted, however, when determining whether a reasonable apprehension exists, the test is an objective one, and the subjective intent of a plaintiff or defendant is irrelevant. *Goodyear Tire*, 824 F.2d at 955-56;*Vangaurd Research*, 304 F.3d at 1255.

In opposition, MasterCard argues that Lexcel's conduct amounted to an express charge of infringement, and that even assuming it did not, jurisdiction is still proper because the totality of Lexcel's conduct created a reasonable apprehension of a future lawsuit. MasterCard points to a letter it received from Lexcel, dated September 4, 2003 (the "September 4 Letter"), in which Lexcel charged that it may have a claim for patent infringement against MasterCard and would consider such infringement to be willful. (Compl. ¶ 14; Dunn Decl. Ex. B. at 2.) Additionally, MasterCard alleges that Lexcel asserted it owned two patents that would prevent MasterCard from "pursuing alternate sourcing of network testing and/or simulator software other than from Lexcel without facing a lawsuit from Lexcel."(Compl.¶ 15.) MasterCard argues that Lexcel's conduct placed it under a reasonable apprehension that Lexcel would file a patent infringement suit if MasterCard were to use another vendor's software. (Compl.¶ 16.)

**\*4** This Court finds that Lexcel's conduct constituted an express charge of infringement that created a reasonable apprehension of suit by MasterCard. Specifically, in the September 4 Letter from Lexcel's counsel to MasterCard's counsel in the Arizona Action, Lexcel charged that it:

reserves all rights for any claim that Lexcel might have for patent infringement that may occur in the future or that may have already occurred. Indeed, we would consider any infringement to be willful, notwithstanding your suggestion that an action for patent infringement would be "ill advised."

MasterCard should know, better than anyone, the process covered in Lexcel's patents for testing software readiness was not known previously.... In fact, it is my understanding that MasterCard had a failed effort at providing a testing and certification software system before it went to Lexcel. As you know, this is powerful evidence of patent validity, on top of the statutory presumption of validity. You should also see the brochures that MasterCard has distributed which tout the advantages and character of Lexcel's software. This, too, will be powerful evidence.

(Dunn Decl. Ex. B. at 2.) This is the paradigm of an express charge of infringement. *SeeArrowhead*, 846 F.2d at 737-38 (finding express charge of infringement where defendant's letter made "thinly veiled threats" to enforce its patent rights by litigation); *FindWhat.com v. Overture Servs.*, 02 Civ. 447(MBM), 2003 WL 403649, at *3-4 (S.D.N.Y. Feb. 21, 2003) (finding express charge of infringement where defendant asserted to plaintiff in conversation that plaintiff was infringing its patent) (citing *Applexion S.A. v. Almalgamated Sugar Co.*, No. 95 C 858, 1995 WL 229049 (N.D.Ill. Apr. 17, 1995) (same)). Indeed, Lexcel expressly warns that it may pursue a patent infringement suit against MasterCard for past or future conduct, and cites to "powerful evidence" of its patents' validity. (Dunn Decl. Ex. B at 2.) "If [a] defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more."*Arrowhead Indus.*, 846 F.2d at 736.

The facts of the present case are analogous to those in *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953 (Fed.Cir.1987). In *Goodyear Tire*, the Federal Circuit reversed a district court's dismissal of a declaratory judgment action and held that plaintiff had an objectively reasonable apprehension that defendant would file a patent infringement suit because: (1) the defendant had filed a trade secret misappropriation claim against plaintiff in state court that related to the same technology; and (2) the defendant had made innuendos during negotiations over the state court action that could have reasonably led the plaintiff to believe defendant would bring a patent infringement action. *SeeGoodyear*, 824 F.2d at 955-56 (finding "objective inference of an impending infringement suit" where defendant asserted patents and made "innuendoes" concerning possible litigation during settlement negotiations in a separate action).

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**\*5** That the parties were engaged in compromise negotiations when Lexcel advanced a charge of infringement is of no moment. *Goodyear,* 824 F.2d at 955-56. Further, the existence of Lexcel's suit against MasterCard for the same technology in another forum also favors a finding of a reasonable apprehension of suit because it demonstrates a "willingness to protect that technology." *Vanguard Research,* 304 F.3d at 1255 (reversing district court dismissal, holding that plaintiff had a reasonable apprehension of suit where defendant had filed a previous misappropriation of trade secrets claim relating to the same technology). Accordingly, this Court finds that Lexcel's conduct created an objective reasonable apprehension of suit.

### B. *Production of the Accused Device*

Lexcel argues for the first time in its reply brief that MasterCard cannot meet the requirements for initiating a declaratory judgment action because it has not actually produced or prepared to produce the accused device. (Def. Reply Br. at 1-2.) MasterCard, however, avers in its complaint that it is preparing to release its competitive "Alternative Software" into the market shortly, and details "concrete steps" it has undertaken in preparation for that release. (Compl.¶ 15.) Indeed, MasterCard's supporting affidavits and exhibits support its assertion that it has developed the Alternative Software, that it will market to financial institutions in early 2004. (Dix Decl. I ¶¶ 9, 16, 18; Dix Decl. II ¶¶ 3-5, Ex. A.) Lexcel fails to raise anything other than its own conjecture to dispute Mastercard's position. Thus, Lexcel's argument that MasterCard fails to meet this second requirement of the Declaratory Judgment Act is without merit.

In conclusion, this Court finds that Lexcel's conduct created a reasonable apprehension that a lawsuit would be initiated and that MasterCard has already taken steps to produce the accused device. Accordingly, this Court has subject matter jurisdiction over this action because MasterCard has established an actionable case or controversy under the Declaratory Judgment Act. Lexcel's 12(b)(1) motion to dismiss is denied.

### III. *Motion to Transfer Venue*

Lexcel also moves to transfer this action to the District of Arizona for consolidation with the parties' action currently pending there. Section 1404(a) states that "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a) (2004). The goal of Section 1404(a)"is to prevent waste of 'time, energy and money' and 'to protect litigants, witnesses and [the] public against unnecessary inconvenience and expense.' ' *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964) (internal quotations omitted); *accordCiticorp Leasing, Inc. v. United Am. Funding, Inc.,* 03 Civ. 1586(WHP), 2004 WL 102761, at \*2 (S.D.N.Y. Jan. 21, 2004). In analyzing a motion to transfer venue, courts use "broad discretion" and must make their determinations "upon notions of convenience and fairness on a case-by-case basis." *In re Nematron Corp. Sec. Litig.,* 30 F.Supp.2d 397, 399 (S.D.N.Y.1998); *accordBionx Implants, Inc. v. Biomet, Inc.,* 99 Civ. 0740(WHP), 1999 WL 342306, at \*3 (S .D.N.Y. May 27, 1999) (district court has "considerable discretion" in deciding whether to transfer venue).

**\*6** In determining whether to transfer venue, courts examine: (1) whether the action could have been brought in the proposed transferee forum; and (2) whether the transfer would "promote the convenience of parties and witnesses and would be in the interests of justice."*Clarendon Nat'l Ins. Co. v. Pascual,* 99 Civ. 10840(JGK)(AJP), 2000 WL 270862, at \*2 (S.D.N.Y. Mar. 13, 2000). The parties do not dispute that this action could be brought in the District of Arizona. Instead, they focus on whether transfer would promote the interests of justice and convenience of the parties.

In analyzing whether transfer would promote such interests, courts consider several factors, including: (1) the place where the operative facts occurred; (2) the convenience of the parties; (3) the convenience of the witnesses; (4) the relative ease of access of proof; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the plaintiff's choice of forum; (7) the forum's familiarity with the governing law; and (8) trial efficiency and the interests of justice.

*Clarendon Nat'l Ins.,* 2000 WL 270862, at \*3;*accordJ. Lyons Co. v. Republic of Tea, Inc.,* 892 F.Supp. 486, 492 (S.D.N.Y.1995)."There is no rigid formula for balancing these factors and no single one of them is determinative."*Citigroup, Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 561 (S.D.N.Y.2000)."In performing the analysis the Court must, however, give due deference to the plaintiff's choice of forum which should not be

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

disturbed unless the balance of convenience and justice weigh heavily in favor of defendant's forum."*Citigroup,* 97 F.Supp.2d at 561;*accordReliance Ins. Co. v. Six Star, Inc.,* 155 F.Supp.2d 49, 57 (S.D.N.Y.2001); *NBA Props., Inc. v. Salvino, Inc.,* 99 Civ. 11799(AGS), 2000 WL 323257, at *3 (S.D.N.Y. Mar. 27, 2000). Further, the balancing of these factors is an equitable task and an "ample degree of discretion is afforded to the district courts in determining a suitable forum."*First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 80 (2d Cir.1989). Finally, the moving party, Lexcel, bears the burden of establishing by clear and convincing evidence that transfer is appropriate.*Reliance,* 155 F.Supp.2d at 56.

### A. *Balance of Conveniences*

After conducting an analysis of the balance of conveniences, this Court finds that the factors weigh heavily in favor of transfer to the District of Arizona. First, the locus of operative facts favors transfer. "In determining the locus of operative facts a court must look to the site of events from which the claim arises."*Transatlantic Reinsurance Co. v. Continental Ins. Co.,* 03 Civ. 3227(CBM), 2003 WL 22743829, at *5 (Nov. 20, 2003) (internal citations omitted)."In infringement cases the operative facts usually relate 'to the design, development and production of a patented product.' " *Findwhat.com,* 2003 WL 402649, at *6 (quoting *Invivo Research, Inc. v. Magnetic Resonance Equipment Corp.,* 119 F.Supp.2d 433,439 (S.D.N.Y.2000)); *accordBionx Implants,* 1999 WL 342306, at *4. MasterCard's complaint alleging invalidity, unenforceability and noninfringment is largely focused on the contention that Lexcel failed to disclose prior art to the PTO during prosecution of the patents-in-suit. (Compl. ¶ ¶ 17-21, 30-39, Prayer for Relief at B-C.) Against that backdrop, the locus of operative facts strongly support transfer to Arizona, and do not weigh in favor of a New York forum. This action arose in Arizona, where Carl Kubitz, Lexcel's CEO, invented the patented systems. Additionally, the prosecution of the patent, which is essential to this action, took place in Arizona. (Declaration of Carl Kubitz, dated October 29, 2003 ("C. Kubitz Decl. I") ¶ 5; Reply Declaration of Carl Kubitz, dated November 19, 2003 ("C. Kubitz Decl. II") ¶ 2.) That the locus of operative facts concerning Lexcel's patents is in Arizona is further supported by the fact that all of Lexcel's employees with knowledge of Lexcel's products and patents continue to reside there, and all of Lexcel's records concerning the patented technology and its

prosecution are maintained at Lexcel's headquarters in Scottsdale, Arizona. (Declaration of Flora Kubitz, dated October 29, 2003 ("F. Kubitz Decl.") ¶ 10; C. Kubitz Decl. II ¶ 2.) Since this action has only a gossamer connection to New York, this factor weighs strongly in favor of transfer. *SeeUnited States v. Nature's Farm Products, Inc.,* 00 Civ. 6593(SHS), 2004 WL 1077968, at *5 (S.D.N.Y. May 13, 2004) (transferring venue where locus of operative facts occurred mainly in transferee venue).

*7 The convenience of witnesses is a neutral factor. Most, if not all, of the trial witnesses in this action will be party witnesses. All of Lexcel's employees and witnesses with knowledge of Lexcel's products and patents, including the inventor Carl Kubitz and the attorney who prosecuted the patents, reside in Arizona. (C. Kubitz Decl. I ¶ 5; F. Kubitz Decl. ¶ 10.) MasterCard's employees with knowledge of the development of the Alternative Software are located at its operations center in O'Fallon, Missouri. (F. Kubitz Decl. ¶ 4; Dix Decl. I ¶ 19.) MasterCard argues that two of its party witnesses reside in Purchase, New York and Miami, Florida, respectively. However, their testimony concerning prior use of simulation software will be presented in the Arizona Action in connection with Lexcel's copyright infringement claim. (C. Kubitz Decl. II ¶ ¶ 4-5; Declaration of Christopher Cosgrove, dated November 13, 2003 ("Cosgrove Decl.") ¶ 2; Declaration of Raquel White, dated November 13, 2003 ("White Decl.") ¶ ¶ 2-3.) Thus, this factor is neutral as party witnesses are located in Missouri, Arizona, New York, and Florida.

MasterCard identifies a vendor located in Belgium that may be a non-party witness outside of this Court's subpoena power. At this stage, this Court cannot assess the relevance and availability of that non-party witness. Accordingly, this Court finds the process over unwilling witnesses factor to be neutral.

The location of documents factor favors transfer. All of Lexcel's documents concerning the patents in suit are located in Arizona and the technology at issue in both actions was developed in Arizona. (C. Kubitz Decl. I ¶ 5; F. Kubitz Decl. ¶ 10.) Most of MasterCard's documents are located in O'Fallon, Missouri, where it conducts primary oversight and development of the Alternative Software. (Dix Decl. I ¶ ¶ 19-20; F. Kubitz Decl. ¶ 9.) Additional documents may be located in Belgium, where MasterCard's new, non-party vendor is located. (Dix Decl. ¶ 20.) While MasterCard contends that some documents are located in Purchase, New York, at its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

global headquarters (Dix Decl. ¶ 20), it does not explain how those documents are related to this action, much less how they relate to the development of the Alternative Software. After a review of the parties' submissions, it is evident that most of the pertinent documents in this action will be found in Arizona and Missouri. Accordingly, this factor weighs in favor of transfer.

The relative means of parties factor also favors transfer. "A party arguing against or for transfer because of inadequate means must offer documentation to show that transfer (or lack thereof) would be unduly burdensome to his finances."*Federman Assocs. v. Paradigm Med. Indus., Inc.,* 96 Civ. 8545 (BSJ), 1997 WL 811539, at *4 (S.D.N.Y. Apr. 8, 1997); *accordOrb Factory, Ltd. v. Design Sci. Toys, Ltd.,* 6 F.Supp.2d 203, 210 (S.D.N.Y.1998). Lexcel notes that the disparity in wealth between the parties is significant, and avers that it would be unable to sustain a viable business and litigate two actions against MasterCard in two fora. (F. Kubitz Decl. ¶ 7; Declaration of Michael O. Sutton, Esq. ("Sutton Decl.") ¶ 4.) Examining the relative means of the parties, Lexcel's net income was $489,000 in 2002, as opposed to MasterCard Inc.'s revenues of $1.89 billion and net income of $116 million in 2002. (F. Kubitz Decl. ¶ 5; Dunn Decl. Ex. E at 5: MasterCard Income Statement.) Indeed, according to MasterCard's exhibits, Lexcel's highest credit line is $21,200, and it has a "moderate risk of severe payment delinquency over the next 12 months."(Def. Opp. Ex. 6: D & B Report at 2-4.) This vast disparity between the parties' relative means, along with the fact that dual litigation will likely hamper Lexcel's viability, weighs heavily in favor of transfer. *SeeLynch v. Nat'l Prescription Adm'rs,* 03 Civ. 1303(GBD), 2004 WL 385156, at *4 (S.D.N.Y. Mar. 1, 2004) (relative means factor favors transfer where litigation would pose a greater financial burden on party with lesser resources); *Everest Capital Ltd. v. Everest Mgmt., L.L.C.,* 178 F.Supp.2d 459, 467-68 (S.D.N.Y.2002) (same); *see alsoMattel, Inc. v. Procount Business Servs.,* 03 Civ. 7234(RWS), 2004 WL 502190, at *4 (S.D.N.Y. Mar. 10, 2004) (transferring action due in part to vast disparity in relative means between parties).

*8 The choice of forum factor also weighs in favor of transfer. While MasterCard's choice of forum is entitled to a heavy presumption, that presumption is rebutted by the application of the first-filed rule. The first-filed rule creates a presumption that the first suit should have priority between two similar actions filed in different fora. *Reliance,* 155 F.Supp.2d at

54;*Findwhat.com,* 2003 WL 402649, at *4-5 (citing *Kahn v. Gen. Motors Corp.,* 889 F.2d 1078, 1081 (Fed.Cir.1989)). There are sufficient overlapping factual and legal issues between this action and the first-filed Arizona Action to trigger the first-filed rule. *SeeGT Plus, Ltd. v. Ja-Ru, Inc.,* 41 F.Supp.2d 421, 423-24 (S.D.N.Y.1998) (noting that the first-filed rule "generally applies where two actions involve same parties and embrace same issues"); *Mfrs. Hanover Trust Co. v. Palmer Corp.,* 798 F.Supp. 161, 166-67 (S.D.N.Y.1991) (finding cases related where they involved the same underlying facts, witnesses and parties and stating that "[t]he interests of justice require that the cases be related, not identical."). Indeed, both actions involve identical technology, and arise out of the same dispute between the same parties. While this action involves patents, and the Arizona Action involves, *interalia,* misappropriation of trade secrets, copyright infringement and unfair competition, both actions concern alleged misappropriation of either the source code or the structure of the same electronic funds transfer testing equipment. (Compl. ¶¶ 1-16; Dunn Decl. Ex. F ¶¶ 11-18; Tr. at 11.) Additionally, any facts supporting a claim of willfulness here would be identical to facts supporting Lexcel's claims in the Arizona Action, including those for exemplary damages and statutory damages for willful infringement. (Dunn Decl. Ex. F ¶ 52, Prayer for Relief at ¶ b.) Accordingly, this factor favors transfer of venue.

The forum's familiarity with the law is a neutral factor since "all federal district courts are assumed to be equally familiar with federal patent law."*Findwhat.com,* 2003 WL 402649, at *6 (citing *Recoton Corp. v. Allsop, Inc.,* 999 F.Supp. 574, 578 (S.D.N.Y.1998)).

Finally, judicial economy dictates that this action proceed in the District of Arizona. Judicial economy is "a separate component of the [c]ourt's [Section] 1404(a)transfer analysis ... and may be determinative in a particular case."*Tucker Anthony, Inc. v. Bankers Trust Co.,* 93 Civ. 0257(SWK), 1994 WL 9683, at *8 (S.D.N.Y. Jan. 10, 1994) (citing *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220 (7th Cir.1986)). One of the goals of Section 1404(a) is to "prevent the waste of 'time, energy and money' and 'to protect litigants witnesses and the public against unnecessary inconvenience and expense." ' *Van Dusen,* 376 U.S. at 616. It would be inefficient and a waste of judicial resources to subject the same parties to suit over interconnected claims concerning identical technology and underlying disputes in two separate fora. *SeeWyndham Assocs. v. Bintliff,* 398

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

F.2d 614, 619 (2d Cir.1968) (noting the "strong policy favoring litigation of related claims" in the same forum). Indeed, the witnesses who may testify in this action are identical to the witnesses identified in the District of Arizona litigation. (*See, e.g.,* C. Kubitz Decl. II ¶ ¶ 4-5; Cosgrove Decl. ¶ 2; White Decl. ¶ ¶ 2-3; Dix Decl. I ¶ ¶ 2-15; Dix Decl. II ¶ ¶ 2-5; F. Kubitz Decl. ¶ 10.) To compel such witnesses to travel to a second forum to give similar testimony on the **same technology** and dispute would be burdensome and inefficient for the parties, and would not promote judicial efficiency. *See 800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F.Supp. 128, 135-36 (S.D.N.Y.1994)* ("The interests of judicial economy dictate that the two identical actions not both proceed"); *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 11 F.Supp.2d 729, 730-31 (S.D.N.Y.2003)* (transferring patent infringement action where trial efficiency factor weighed heavily in favor of **transfer**). Accordingly, this factor strongly favors **transfer**.

### B. *Aggregation of Factors*

**\*9** Analyzing the Section 1404(a) factors as a whole, Lexcel overcomes the heavy presumption that this action should remain in New York. Of the eight convenience factors, the locus of operative facts, location of documents, relative means of parties, choice of forum and judicial economy factors strongly favor transfer to the District of Arizona. The forum's familiarity with the governing law, convenience of witnesses, and availability of process factors are neutral, and thus favor litigation of this action in New York. Accordingly, this Court finds that Lexcel has shown by clear and convincing evidence that transfer of this action to the District of Arizona would be in the interests of convenience and fairness.

### CONCLUSION

For the reasons set forth in this Memorandum and Order, Lexcel's motion to dismiss the action is denied and its motion to transfer this action to the District of Arizona is granted. The Clerk of Court is directed to transfer this action to the District of Arizona, Phoenix Division, as related to case number CV 03 1454(PHX)(JAT).

S.D.N.Y.,2004.
MasterCard International, Inc. v. Lexcel Solutions, Inc.

Not Reported in F.Supp.2d, 2004 WL 1368299 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22939214 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

**C**
The Whistler Group, Inc. v. PNI Corp.
N.D.Tex.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas, Dallas
Division.
THE WHISTLER GROUP, INC., Plaintiff,
v.
PNI CORPORATION, Defendant.
**No. Civ.A.3:03-CV-1536-G.**

Dec. 5, 2003.

David W. Carstens, Scott L. Harper, Carstens, Yee &
Cahoon, Dallas, TX, for Plaintiff.
Arthur I. Navarro, Godwin Gruber, Dallas, TX,
David P. Morales, Don R. Mollick, Robert W. Payne,
LaRiviere, Grubman & Payne, Monterey, CA, for
Defendant.

*MEMORANDUM ORDER*

FISH, Chief J.
     *1 Before the court is the motion of the
defendant PNI Corporation ("PNI") to stay or enjoin
this case until the conclusion of a related action
already pending in the United States District Court
for the Northern District of California or,
alternatively, to transfer this case to that district
pursuant to 28 U.S.C. § 1404(a), or to otherwise
dismiss this case for refiling in that district. For the
reasons discussed below, PNI's alternative motion to
transfer is granted, and PNI's further motions to stay
or enjoin and to dismiss are denied as moot.

I. *BACKGROUND*

     This case involves a patent dispute between PNI
and the Whistler Group, Inc. ("Whistler"). Plaintiff
Whistler is a Texas corporation with its principal
place of business in Bentonville, Arkansas. *See*
Plaintiff the Whistler Group, Inc.'s Original
Complaint ("Complaint") ¶ 4; Plaintiff the Whistler
Group, Inc.'s Brief in Opposition to Defendant PNI
Corporation's Motion to Stay or Enjoin or,

Alternatively, to Transfer or Dismiss ("Opposition
Brief") at 5. Defendant PNI is a California
corporation with its principal place of business in
Santa Rosa, California. *See* Memorandum of Points
and Authorities in Support of Defendant PNI
Corporation's Notice of Motion and Motion to Stay
or Enjoin or, Alternatively, to Transfer or Dismiss
("Motion") at 2. Both corporations are in the business
of designing and selling radar/laser detectors. *See*
Opposition Brief at 2, 3; Motion at 1.

     On May 30, 2003, PNI filed suit in the United
States District Court for the Northern District of
California (the "California litigation"), alleging that
Whistler had infringed and continued to infringe
PNI's U.S. Patent No. 6,549,145 (issued Apr. 15,
2003)(" '145 Patent"). *See* PNI's Complaint for Patent
Infringement at 1, No. C-03-2562, *attached to* Motion
as Exhibit C; *see also* Motion at 1. Simply stated,
PNI's '145 Patent is a combination radar/laser
detector with multi-sensing technology that is
programmed to provide a range of functions,
including weather information and road conditions.
*See*'145 Patent at 1, *attached to* Motion as Exhibit A;
Reply at 5 ("multi-sensing technology"); Opposition
Brief at 2 ("digital compass technology"). Nearly six
weeks later, on July 8, 2003, Whistler filed the
instant suit in the United States District Court for the
Northern District of Texas (the "Texas litigation"),
alleging that PNI had infringed and continued to
infringe Whistler's U.S. Patent No. 5,990,821 (issued
Nov. 23, 1999)(" '821 Patent"). *See* Complaint ¶ ¶
7-13. Whistler's '821 Patent discloses a lens structure
for improving the detection of a radar signal. *See*'821
Patent, *attached to* Complaint as Exhibit A;
Opposition Brief at 2 ("speed detection systems") and
3 ("lens structure used for improving the detection of
a radar signal"); Reply at 2. On September 22, 2003,
PNI filed this motion to stay or enjoin this action
pending resolution of the California litigation or,
alternatively, to transfer this action to the Northern
District of California or dismiss this action for
refiling in that district. *See generally* Defendant PNI
Corporation's Notice of Motion and Motion to Stay
or Enjoin or, Alternatively, to Transfer or Dismiss.

II. *ANALYSIS*

©  2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### A. *The Legal Standard*

*2 A district court may transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice, ... to any other district or division where it might have been brought."28 U.S.C. § 1404(a). The purpose of Section 1404(a)"is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense....' " ' *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (quoting *Continental Grain Company v. Barge FBL-585,* 364 U.S. 19, 26, 27, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960)). The decision to transfer a pending case is committed to the sound discretion of the district court. *Jarvis Christian College v. Exxon Corporation,* 845 F.2d 523, 528 (5th Cir.1988); see also *Balawajder v. Scott,* 160 F.3d 1066, 1067 (5th Cir.1998), *cert. denied,*526 U.S. 1157, 119 S.Ct. 2044, 144 L.Ed.2d 212 (1999); *Caldwell v. Palmetto State Savings Bank of South Carolina,* 811 F.2d 916, 919 (5th Cir.1987). In exercising its discretion, the court considers "all relevant factors to determine whether or not on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Peteet v. Dow Chemical Company,* 868 F.2d 1428, 1436 (5th Cir.) (internal quotations and citations omitted), *cert. denied,*439 U.S. 935 (1989).

Generally, the plaintiff is afforded some deference in choosing a forum.*Time, Inc. v. Manning,* 366 F.2d 690, 698 (5th Cir.1966); *Lindloff v. Schenectady International,* 950 F.Supp. 183, 185 (E.D.Tex.1996). However, the plaintiff's choice of forum has reduced significance where most of the operative facts occurred outside the district. *Lindloff,* 950 F.Supp. at 185; see also *Robertson v. Kiamichi Railroad Company, L.L.C.,* 42 F.Supp.2d 651, 656 (E.D.Tex.1999). The plaintiff's forum choice is also given less weight when the plaintiff brings suit outside its home district. *Hanby v. Shell Oil Company,* 144 F.Supp.2d 673, 677 (E.D.Tex.2001); *Rock Bit International, Inc. v. Smith International, Inc.,* 957 F.Supp. 843, 844 (E.D.Tex.1997); *Alexander & Alexander, Inc. v. Donald F. Muldoon & Company,* 685 F.Supp. 346, 349 (S.D.N.Y.1988).

In deciding whether to transfer a case, the court should consider (1) the convenience of the parties, (2) the convenience of material witnesses, (3) the availability of process to compel the presence of unwilling witnesses, (4) the cost of obtaining the presence of witnesses, (5) the relative ease of access to sources of proof, (6) calendar congestion, (7) where the events in issue took place, and (8) the interests of justice in general. *Minka Lighting, Inc. v. Trans Globe Imports, Inc.,* No. 3:02-CV-2538-G, 2003 WL 21251684 at *2 (N.D.Tex. May 23, 2003) (Fish, CJ); see also *Gundle Lining Construction Corporation v. Fireman's Fund Insurance Company,* 844 F.Supp. 1163, 1165 (S.D.Tex.1994). Each of these factors will be analyzed to determine whether this case should be transferred to the United States District Court for the Northern District of California.

### B. *Factor (1): The Convenience of the Parties*

*3 It is clear that, as a matter of convenience and economics, PNI-a California corporation-would benefit from litigating this matter in its home district rather than halfway across the country in the Northern District of Texas. It is equally clear that, as a matter of convenience and economics, Whistler would benefit by retaining this action in the Northern District of Texas. Notwithstanding the benefits of having a home district advantage, a shift of inconvenience from one party to another normally will not justify transfer. See *Medi USA, L.P. v. Jobst Institute, Inc.,* 791 F.Supp. 208, 211 (N.D.Ill.1992).

The court is persuaded, however, by PNI's contention that "client economy would ... be served by hearing both actions before the same tribunal."Reply at 6. In this case, not only are the parties to each suit identical, *see* Motion at 5; Reply at 7, 8; *but see* Opposition Brief at 2, 8,[FN1] but, as discussed below, hearing both radar detector patent infringement cases before the same tribunal will conserve time, energy, and money for everyone involved. See *Ferens v. John Deere Company,* 494 U.S. 516, 531, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) ("[T]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different [d]istrict [c]ourts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent.") (quoting *Continental Grain,* 364 U.S. at 26);*see also* Reply at 6. Given these considerations, the court concludes that the convenience of the parties weighs in favor of a transfer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3
Not Reported in F.Supp.2d, 2003 WL 22939214 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

FN1. Whistler argues that "[t]he parties to the California and [Texas] litigation are different," because while PNI sued both Whistler and Wal-Mart Stores, Inc. ("Wal-Mart") in the California litigation, Whistler sued only PNI in the Texas litigation. Opposition Brief at 2, 8. However, in its reply, PNI produced a document entitled "Mutual Release" that released Wal-Mart from the California litigation. See Mutual Release, *attached to* Reply as Exhibit A. This document was signed by Wal-Mart on August 25, 2003, Whistler on September 29, 2003 (Whistler filed its Opposition Brief on October 4, 2003), and PNI on October 7, 2003. *Id.* With Wal-Mart's release from the California litigation, the parties to both suits are the same.

C. *Factors (2), (3), and (4): The Convenience of Material Witnesses, Availability of Process, and Cost of Obtaining Witnesses*

The convenience of the witnesses is often regarded as the most important factor to be considered in deciding whether to transfer venue. *Travelers Indemnity Company of America v. National Union Fire Insurance Company of Pittsburgh, Pennsylvania,* No. 3:02-CV-0585-G, 2002 WL 1575409 at *2 (N.D.Tex. July 16, 2002)* (Fish, CJ); *Gundle,* 844 F.Supp. at 1166;*Fletcher v. Southern Pacific Transportation Company,* 648 F.Supp. 1400, 1401-02 (E.D.Tex.1986). Of the witnesses, the convenience of the non-party witnesses is accorded the greatest weight. *Travelers Indemnity,* 2002 WL 1575409 at *2;*Gundle,* 844 F.Supp. at 1166. A party seeking a transfer for the convenience of witnesses "must specifically identify the key witnesses and outline the substance of their testimony."*N2 Consulting, LLC v. Engineered Fastener Company,* No. 3-02-CV-0308-BD, 2002 WL 31246770 at *3 (N.D.Tex. Oct.2, 2002) (Magistrate Judge Kaplan) (internal quotations and citations omitted).

Here, PNI alleges that "[m]ost, if not all," of its currently known material witnesses are located in California and hints that obtaining the presence of these witnesses for trial in Texas would be inconvenient and costly. *See* Motion at 2, 7. Although two potential witnesses identified by PNI-the inventors of the patents allegedly infringed-are

California residents,[FN2] see *id.* at 6-7, PNI fails specifically to identify any other potential party or non-party witness. See *N2 Consulting,* 2002 WL 31246770 at *3;*AMS Staff Leasing v. Starving Students, Inc.,* No. 3-03-CV-0383-BD, 2003 WL 21436476 at *2 (N.D.Tex. Jun.18, 2003)* (Magistrate Judge Kaplan). Nor has PNI shown that transfer is necessary to compel the attendance of any witness, that any witness would be either unwilling or unable to travel to Texas for trial, or that the testimony of any witness is important to this case. See *id.* at *3.

FN2. If the inventors of the '145 Patent are employees of PNI, their convenience is entitled to less weight because PNI is able to compel their attendance at trial. See *AMS Staff Leasing v. Starving Students, Inc.,* No. 3:03-CV-0383-BD, 2003 WL 21436476 at *3 (N.D.Tex. June 18, 2003)* (Magistrate Judge Kaplan). Whether the inventors are non-party witnesses and their convenience is entitled to greater weight, the court cannot tell.

**\*4** Despite PNI's failure specifically to identify the key witnesses and outline the substance of their testimony, the court concludes that the convenience of the parties weighs in favor of a transfer given the added convenience and economies arising from hearing the California and Texas litigations before the same tribunal. It does not appear that transfer would cause any additional inconvenience to Whistler's witnesses, who already reside outside of Texas-in Massachusetts and Arkansas. *See* Opposition Brief at 7. Moreover, given the relatedness of the patented devices at issue, the court is convinced that the witnesses in both cases will overlap-although the extent of overlap is unknown. *See* Reply at 4; Opposition Brief at 7.

D. *Factors (5) and (7); Where the Events Took Place and Sources of Proof*

In a patent infringement action, the preferred forum is that which is the center of gravity of the accused activity. *Minka Lighting,* 2003 WL 21251684 at *3; accord *Laitram Corporation v. Hewlett-Packard Company,* 120 F.Supp.2d 607, 609 (E.D.La.2000); *Proshot Golf, Inc. v. Leading Edge Technologies, Inc.,* No. 3:96-CV-1906-D, 1996 WL 673265 at *2 (N.D.Tex. Oct.31, 1996). Indeed, "[t]he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22939214 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

trier of fact ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production."*Minka Lighting, 2003 WL 21251684 at \*3* (quoting *S.C. Johnson & Son, Inc. v. Gillette Company, 571 F.Supp. 1185, 1188 (N.D.Ill.1983)*). In finding that center of gravity, a district court should consider the location of a product's development, testing, research, and production. *Id.;* see also *Laitram Corporation, 120 F.Supp.2d at 609;Proshot Golf, 1996 WL 673265 at \*2.* The location of the alleged infringer (here, PNI)'s-principal place of business, therefore, is often the critical and controlling consideration in adjudicating a motion to transfer venue. *Id.;Houston Trial Reports, Inc. v. LRP Publications, Inc., 85 F.Supp.2d 663, 668 (S.D.Tex.1999)* (citations omitted).

In the case *sub judice,* PNI's motion reveals that the events at issue took place in California and that its sources of proof, consisting principally of witnesses, prior art, and documentary evidence, are located in California. *See* Motion at 5-7. Whistler, however, offers no refuting evidence-perhaps because none exists-that the events giving rise to its cause of action took place in Texas or that its sources of proof are situated in Texas. In fact, the "center of gravity" of the accused activity-*i.e.,* the place where product development, testing, research, and production as well as any marketing and sales decisions occurred-is most likely PNI's home offices in Santa Rosa, California. Consequently, the factors concerning the locus of the events in issue and access to sources of proof weigh in favor of transfer.

#### E. *Factor (6): Calendar Congestion*

Neither party has presented arguments related to the comparative calendar congestion (*i.e.,* the amount of time needed to adjudicate a civil dispute) in the Northern District of Texas or the Northern District of California. This factor thus has neutral weight in the analysis.

#### F. *Factor (8): The Interest of Justice*

**\*5** "Piecemeal litigation in the complex and technical area of patent and trademark law is especially undesirable."*Datatreasury Corporation v.*

*First Data Corporation, 243 F.Supp.2d 591, 594 (N.D.Tex.2003)* (Magistrate Judge Kaplan) (citing *Smiths Industries Medical Systems, Inc. v. Ballard Medical Products, Inc., 728 F.Supp. 6, 7 (D.D.C.1989)*). In such cases, the interest of justice may dictate transfer "to prevent an extravagantly wasteful and useless duplication of the time and effort of the federal courts by the simultaneous trial of two complex and elaborate cases involving substantially the same factual issues."*General Tire & Rubber Company v. Watkins, 373 F.2d 361, 362 (4th Cir.), cert. denied,386 U.S. 960, 87 S.Ct. 1031, 18 L.Ed.2d 109 (1967).* By permitting two different courts to interpret the same patent claims, there is a heightened risk of inconsistent rulings which, in turn, promotes uncertainty and impedes the administration of justice. *Datatreasury, 243 F.Supp.2d at 596.* This untenable prospect favors resolving related patent cases in the same forum whenever possible, see *id. at 594, 596,* even if the convenience of the parties and witnesses calls for a different result. See 15 WRIGHT, MILLER & COOPER, FED. PRAC. & PROC. 2d § 3854 at 439-40 (1986) (suggesting that "the interest of justice may be decisive in ruling on a transfer motion even though the convenience of the parties and witnesses point in a different direction.").

PNI argues that "the interest of justice" requires transferring this case to California where a related patent infringement action is currently pending. *See* Motion at 7, 8; Reply at 3. The court agrees. See, *e.g., Jarvis Christian College, 845 F.2d at 528-29* (concluding that the existence of related litigation in a transferee court is a factor that weighs strongly in favor of transfer). Because the California and Texas litigations involve overlapping core issues, common subject matter, and closely related questions, this Texas litigation should be transferred to the Northern District of California. See *Texas Instruments, Inc. v. Micron Semiconductor, Inc., 815 F.Supp. 994, 997 (E.D.Tex.1993)* (citing *Superior Savings Association v. Bank of Dallas, 705 F.Supp. 326, 328-329 (N.D.Tex.1989)*). Having reviewed arguments from both parties, the court concludes that the similarities in these two litigations are prevalent: (1) both involve exactly the same parties; (2) both involve an examination of prior radar detector art and the validity and scope of similar patents; (3) both will involve overlapping witnesses; and (4) both will involve substantially related questions of fact and, correspondingly, overlapping discovery. *See* Motion at 5; Reply at 3; *but see* Opposition Brief at 6.[FN3] Where such substantial similarities exist, the parties and witnesses, the public, and the courts are entitled to be free from the waste of duplicative litigation.

©  2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 22939214 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

FN3. Whistler argues that because the California and Texas litigations involve "distinct patents that cover distinct technologies," they do not require resolution in the same venue. Opposition Brief at 2. Whistler, however, fails to provide supporting evidence and legal authority to validate this argument. In fact, that actions be identical or duplicative is not a prerequisite to transfer. On the contrary, the court need only determine that "the two actions involve closely related questions or common subject matter, or that the core issues substantially overlap."*Texas Instruments,* 815 F.Supp. at 997. Having thus concluded, the court finds that the interests of justice would be best served by a transfer.

Transferring this Texas litigation to the Northern District of California will serve the objectives of efficient litigation and substantive justice. See *Sundance Leasing Company v. Bingham,* 503 F.Supp. 139, 140 (N.D.Tex.1980) ( "Considerations of judicial economy and efficiency clearly support a policy of having substantially similar matters litigated before the same tribunal."). The district court in *Levitt v. State of Maryland Deposit Insurance Fund Corporation,* 643 F.Supp. 1485 (E.D.N.Y.1986) stated:

*6 [t]ransfer of an action to a district where a related case is pending enables more efficient conduct of pretrial discovery, saves witnesses time and money in both trial and pretrial proceedings, and avoids duplicative litigation and inconsistent results, thereby eliminating unnecessary expense to the parties while at the same time serving the public interest.

*Id.* at 1493 (citations omitted). Similarly here, because there is pending in the Northern District of California a suit pertaining to same technology and similar patents, this infringement action could be more efficiently managed in that venue, see *Optical Recording Corporation v. Capitol-EMI Music, Inc.,* 803 F.Supp. 971, 973-74 (D.Del.1992), and the risk of inconsistent results from both litigations would be avoided. See *Datatreasury,* 243 F.Supp.2d at 596.

Whistler asserts that a transfer is inappropriate because it would "introduce additional delay into both proceedings at the expense of judicial economy."Opposition Brief at 8. But much work

remains before this case can proceed to trial, including additional discovery, motion practice, and judicial construction of the patents-in-suit. See, e.g., *A.P.T., Inc. v. Quad Environmental Technologies Corporation, Inc.,* 698 F.Supp. 718, 723-24 (N.D.Ill.1988) (requiring transfer to "conserve judicial resources and provide for the efficient adjudication of complex litigation due to the possibility of consolidating both discovery and trial"). Although a case management order has been issued and initial disclosures have been exchanged in the California litigation, *see* Opposition Brief at 8-9, "[n]either the passage of time nor involvement in discovery is a reason alone for denying transfer."*Mag Instrument, Inc. v. Sears Roebuck & Company,* No. H-8-2216, 1990 WL 124071 at *3 (S.D.Tex. Jan.31, 1990). Moreover, although delay may be a factor, it is incumbent upon Whistler to show that it will be prejudiced by such a transfer.*Id.* at *4. Whistler has not made such a showing.

"The preference for honoring a plaintiff's choice of forum is simply that, a preference; it is not a right."*E.I. Dupont de Nemours & Company v. Diamond Shamrock Corporation,* 522 F.Supp. 588, 592 (D.Del.1981). Thus, although Whistler's forum choice is clearly a factor to be considered in the venue transfer analysis, "in and of itself it is neither conclusive nor determinative."*In re Horseshoe Entertainment,* 337 F.3d 429, 434 (5th Cir.2002) (citing *Garner v. Wolfinbarger,* 433 F.2d 117, 119 (5th Cir.1970)), *cert. denied,*124 S.Ct. 826, 2003 WL 22289876 (Dec. 1, 2003); *Shoemake v. Union Pacific Railroad Company,* 233 F.Supp.2d 828, 830 (E.D.Tex.2002). Here, Whistler's choice of forum is given less weight because few, if any, of the operative facts appear to have occurred within this district. See, e.g., *Minka Lighting,* 2003 WL 21251684 at *4;*Dearing v. Sigma Chemical Company,* 1 F.Supp.2d 660, 665 (S.D.Tex.1998); *Quicksilver, Inc. v. Academy Corporation,* No. 3:98-CV-1772-R, 1998 WL 874929 at *4 (N.D.Tex. Dec.3, 1998). Consequently, Whistler's choice of forum is not enough to outweigh the balance of the other factors discussed above that favor a transfer to the Northern District of California. See *Shoemake,* 233 F.Supp.2d at 830-31;*Hanby,* 144 F.Supp.2d at 677;*Robertson,* 42 F.Supp.2d at 656;*Rock Bit,* 957 F.Supp.at 844.

III. *CONCLUSION*

Not Reported in F.Supp.2d                                                           Page 6
Not Reported in F.Supp.2d, 2003 WL 22939214 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

*7 PNI has met its burden of demonstrating that "the balance of convenience and justice" weighs heavily in favor of transfer. *Minka Lighting,* 2003 WL 21251684 at *4 (quoting *State Street Capital Corporation v. Dente,* 855 F.Supp. 192, 197 (S.D.Tex.1994)). Litigation of all issues arising under the '145 and '821 patents in one place, before one court, would better serve the ends of efficient litigation and substantial justice. Accordingly, PNI's alternative motion to transfer venue is GRANTED and this action is TRANSFERRED, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Northern District of California.[FN4]

> FN4. In light of this disposition, PNI's motions to stay or enjoin this case or, alternatively, to dismiss this case for refiling, are DENIED as moot.

SO ORDERED.

N.D.Tex.,2003.
The Whistler Group, Inc. v. PNI Corp.
Not Reported in F.Supp.2d, 2003 WL 22939214 (N.D.Tex.)

END OF DOCUMENT

©   2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 162805 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Abbott Laboratories v. Selfcare, Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
ABBOTT LABORATORIES, Plaintiff,
v.
SELFCARE, INC., Princeton Biomeditech
Corporation, and PBM-Selfcare, L.L.C., Defendants.
**No. 98 C 7102.**

March 15, 1999.

MEMORANDUM OPINION

GRADY, District J.
*1 Before the court is defendant's motion to
dismiss or transfer. For the reasons explained below,
the motion to transfer is granted.

BACKGROUND

All of the parties to this case engage in the
business of home pregnancy tests that employ
immunoassay technology. This technology allows
consumers to detect the presence of a pregnancy
hormone in a woman's urine. Apparently, each side
believes that the other's product has infringed its
patents.

On April 17, 1998, Abbott Laboratories
("Abbott") filed a complaint in the United States
District Court for the District of Massachusetts (the
"Massachusetts district court") against two of the
defendants in the instant case, Selfcare, Inc.
("Selfcare") and Princeton Biomeditech Corporation
("PBM").FN1 The Massachusetts lawsuit involves
United States Patent No. 5,654,162 (the " '162
patent") and United States Patent No. 5,073,484 (the
" '484 patent"). Abbott alleged that defendants had
infringed those patents by manufacturing and
marketing a variety of home pregnancy tests that use
immunoassay technology.

FN1. PBM-Selfcare, L.L.C., a subsidiary of
the two named defendants and the third
defendant in this case, was not named in that
action.

On August 5, 1998, the Massachusetts district
court denied Abbott's motion for a preliminary
injunction. In doing so, it relied upon pleadings,
affidavits, and memoranda of law, and heard oral
argument. Abbott Lab. v. Selfcare, Inc., 17 F.Supp.2d
43, 45 (D.Mass.1998). On October 23, 1998,
defendants filed a motion for leave to amend their
answer and counterclaim to assert that Abbott had
infringed two patents owned by PBM-Selfcare,
United States Patent No. 5,559,041 (the " '041
patent") and United States Patent No. 5,728,587 (the
" '587 patent"). The motion also sought leave to add
PBM-Selfcare as a co-counterplaintiff. That motion is
still pending before the Massachusetts district court.

On November 5, 1998, a day before it filed a
response to that motion, Abbott Laboratories filed
this declaratory judgment action. It seeks a
declaration that the '041 patent and the '587 patent,
the subjects of defendants' proposed counterclaim in
the Massachusetts lawsuit, are invalid.

On December 7, 1998, defendants moved to
dismiss or transfer this action. We indicated at a
subsequent status hearing that we would be unlikely
to dismiss the case, and directed the parties to file
memoranda on the issue of transfer, with a particular
focus on the likelihood of duplication of effort or
inconsistent rulings.

DISCUSSION

"For the convenience of parties and witnesses, in
the interest of justice, a district court may transfer
any civil action to any other district or division where
it might have been brought." 28 U.S.C. § 1404(a).
In other words, transfer is appropriate where: "(1)
venue is proper in both the transferor and transferee
court; (2) transfer is for the convenience of the parties
and witnesses; and (3) transfer is in the interest of
justice." Law Bulletin Publ'g, Co. v. LRP Publications,
Inc., 992 F.Supp. 1014, 1017 (N.D.Ill.1998) (citing
Vandeveld v. Christoph, 877 F.Supp. 1160, 1167

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(N.D.Ill.1995). Because the parties agree that venue is proper in both Massachusetts and Illinois, we need only address the second and third elements. Because the interests of justice "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result," we begin our discussion there. *See Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220 (7th Cir.1986).

A. Interests of Justice

*2 When a case is transferred to a district in which a related case is pending, the expectation is that the two cases will be consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, if practicable.*Waller v. Burlington N. R.R. Co.,* 650 F.Supp. 988, 991 (N.D.Ill.1987). Consolidation not only conserves scarce judicial resources, but also reduces the resources ultimately expended by the litigants. *Keppen v. Burlington N. R.R. Co.,* 749 F.Supp. 181, 183-84 (N.D.Ill.1990). By preventing duplicative efforts on the part of both the courts and the parties, transfer and subsequent consolidation serve the interests of justice within the meaning of the venue transfer statute. As the Supreme Court has acknowledged, "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."*Continental Grain Co. v. Barge FBL-585,* 364 U.S. 19, 26 (1960). Transfer of venue also curbs the risk of inconsistent judgments. *Countryman v. Stein Roe & Farnham,* 681 F.Supp. 479, 484 (N.D.Ill.1987). These concerns have led this district to adopt "a strong policy in favor of transferring a case to the district where a related action is pending."*Keppen,* 749 F.Supp. at 184.

The existence of the pending related action in Massachusetts persuades us to transfer this case. Abbott argues that the actions differ because the Massachusetts lawsuit involves its patents while this action involves Selfcare's patents.[FN2] The two actions, even though directed to different patents, involve the same parties and substantially similar technology. They also involve similar complex factual and legal questions that will require the expenditure of considerable time and effort. Requiring two courts to devote limited resources educating themselves about the same underlying technology would undermine values of judicial economy. By holding a preliminary injunction hearing, the Massachusetts district court

has already familiarized itself with this technology. There is no reason we should duplicate those efforts. Abbott also argues that additional discovery in these intertwined actions would "bog the parties down," but fails to persuade us that this would occur. Appropriate case management will avoid any such problem.

> FN2. Abbott further argues that the immunoassay technology is extremely common, and this scientific process has been the subject of many federal cases. Contrary to Abbott's implication, however, our holding today is not precedent for the transfer of all cases involving this technology, regardless of the identity of the parties and the existence of a relationship between the patents, to the Massachusetts district court. Nor would our ruling today require all unrelated cases between these particular parties to go before the Massachusetts district court. It addresses only the facts of this case, which involve the same parties' claims regarding substantially similar patent issues.

In addition, we do not wish to risk conflicting rulings. Abbott argues that the Massachusetts district court has not indicated that it intends to hold a *Markman* hearing, but that fact does not assuage our concerns. First, that court's present disinclination to hold a hearing does not mean that such a hearing will never take place. Second, we can imagine many identical issues that might arise in each court, quite apart from *Markman* issues. For example, the discovery process might produce unseemly confusion or conflict between the courts.[FN3]

> FN3. The parties' submissions on this motion illustrate this example. They appear to differ strongly over whether a discovery cut-off for March 31, 1999, exists in the Massachusetts action. Because any dispute over discovery in that lawsuit is properly before the Massachusetts district court, we take no position on it here. We only note that, were we to do so, we might well risk coming into conflict with a subsequent order by the Massachusetts district court on precisely the same issue.

B. Convenience

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 162805 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*3** Normally, the moving party must show that the transferee court is more convenient. *Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1293 (7th Cir.1989); *Chemical Waste Management, Inc. v. Sims,* 870 F.Supp. 870, 876 (N.D.Ill.1994). In determining whether the moving party has met its burden, the court should consider: (1) plaintiff's forum choice; (2) the situs of material events; (3) ease of access to evidence; (4) convenience of witnesses; and (5) convenience of the parties. *College Craft Cos., Ltd. v. Perry,* 889 F.Supp. 1052, 1054 (N.D.Ill.1995); *Chemical Waste,* 870 F.Supp. at 876.

Here, however, there is no indication that the relative conveniences favor one forum over the other. The two actions will likely involve many of the same witnesses and much common documentary evidence. Discovery will occur at the appropriate locations under the Rules, regardless of where the cases are pending.

The interests of justice render the plaintiff's choice of forum, and the corresponding "first-to-file" doctrine, largely irrelevant. Abbott correctly points out that the doctrine applies to declaratory judgment actions in patent cases. *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 938 (Fed.Cir.1993). Nonetheless, where the interests of justice, especially "considerations of judicial and litigant economy," demand it, the trial court has discretion to dismiss a first-filed action. *Serco Servs. Co., L.P. v. Kelley Co., Inc.,* 51 F.3d 1037, 1039 (Fed.Cir.1995) (citation omitted). By extension, considerations of judicial economy warrant transfer, a far less drastic remedy than dismissal. [FN4]

> FN4. Because the interests of justice are determinative of this case, we need not resolve the parties' dispute over which party filed first. The dispute seems to depend largely on whether the Massachusetts district court grants defendant's motion for leave to file a counterclaim in that action. For the purposes of this motion only, we assume that Abbott's instant declaratory judgment action was the first to be filed.

## CONCLUSION

For the foregoing reasons, we grant defendant's motion to transfer, which renders moot the defendant's alternative motion to dismiss. Pursuant to 28 U.S.C. § 1404(a), this case will be transferred to the United States District Court for the District of Massachusetts.

N.D.Ill.,1999.
Abbott Laboratories v. Selfcare, Inc.
Not Reported in F.Supp.2d, 1999 WL 162805 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.